Gabriel JOHNSON, individually and on behalf of all others similarly situated, Plaintiffs-Appellants,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, et al., Defendants-Appellees.

No. 83–7059.

United States Court of Appeals, Eleventh Circuit.

June 18, 1984.

Allen J. Barkin, Legal Services Corp. of Ala., Joseph E. Carr, IV, Bay Minette, Ala., for plaintiffs-appellants.

E.T. Rolison, Jr., Thomas H. Figures, Asst. U.S. Atty., Mobile, Ala., Fred W. Harris, Jr., Regional Atty., U.S. Dept. of Agriculture, Atlanta, Ga., for defendants-appellees.

Before RONEY, FAY and CLARK, Circuit Judges.

FAY, Circuit Judge:

This lawsuit is a class action by approximately 48,000 residents of Alabama who borrowed money from the Farmers Home Administration (FmHA) under the Rural Housing loan program of Section 502, Title V of the Housing Act of 1949, 42 U.S.C. § 1472 (1980) (the Act). Appellant, Gabriel Johnson, represents a class of mortgagors who seek to set aside the FmHA's foreclosure of their homes. Earnestine Marshall intervened to represent a class of borrowers who are threatened with foreclosure. FmHA foreclosures in Alabama are processed non-judicially. This is permissible under Alabama state law and is authorized in the mortgage contracts by a "power of sale." The class challenges this non-judicial foreclosure method on due process and equal protection bases. The United States District Court for the Southern District of Alabama denied appellants' motion for a preliminary injunction to prevent non-judicial foreclosure. We reverse.

The appellants ask us to decide whether the district court abused its discretion in denying the motion for preliminary injunction. The issues as framed by the appellants are:

1. Whether the District Court erred in finding that Appellants are not likely to succeed on the merits of the case.

   (a) Whether the District Court erred in finding that FmHA's use of non-ju-

dicial foreclosure meets minimal standards of due process.

  (b) Whether the District Court erred in finding that FmHA's use of non-judicial foreclosure meets Fifth Amendment standards of equal protection under the law.

  (c) Whether the District Court erred in finding that FmHA follows the regulations and statutes or that the FmHA acted within its discretion, or that the violations were *de minimis.*

2. Whether the District Court erred in finding that issuing the preliminary injunction would disserve the public interest.

3. Whether the District Court erred in finding that Appellants failed to show that losing their homes, if the injunction were not granted, would outweigh the loss to Appellees if the injunction were granted.

4. Whether the District Court erred in finding that Appellants have not proved that losing their homes will be irreparable injury if the injunction is denied, in that the government can respond in damages and that subsequent owners can be ejected because of the filing of *lis pendens* notices.

The instant case is one of three pending before this panel that challenge the FmHA lending procedure. This case is the only one which deals specifically with Section 502 loan procedures. The other two cases involve 7 U.S.C. § 1981(a) (1980) under which the Secretary is authorized to grant loan deferrals for loans made under the Consolidated Farm and Rural Development Act (CFRDA). *Rowell v. Secretary of Agriculture,* No. 83–7147; *Curry v. Block,* No. 82–8544. Though some issues may seem similar, this Housing Act case is very distinct in that a whole regulatory scheme has been developed to administer the Housing Act which is not yet in place for the CFRDA. These three cases are among many decided and pending that address the FmHA lending programs. *Rowell* is an Alabama case and *Curry* is from Georgia. In *Curry,* Judge Alaimo ordered the FmHA to promulgate regulations for CFRDA similar to those issued for the Housing Act. This case tests the implementation and constitutionality of the Housing Act regulations. The Housing Act procedures utilized in Georgia were reviewed in *Williams v. Butz,* No. CV–176–173 (S.D.Ga. Oct. 1979). In 1977, the FmHA entered a settlement in the *Williams* case by which it agreed henceforth to employ only judicial foreclosures in Georgia, notwithstanding that Georgia law allowed the use of non-judicial foreclosures.

### The Section 502 Loan Program

Before going into the specific facts of the named plaintiffs, it is helpful to discuss the program under which these mortgages were made. The FmHA, a division of the Department of Agriculture, is authorized to make home loans to low-income rural families. The purpose of the Act is to provide decent housing to low-income families who otherwise lack the financial means to buy a home. 42 U.S.C. § 1441. To qualify for a Section 502 loan the borrower must have been refused credit by a private financial institution, *id.,* and must have an income of less than approximately $15,000 in Alabama. 42 U.S.C. § 1471(b)(3); 7 C.F.R. § 1944 Ex. C, Subpt. A (1983).[1] For this purpose, "income" is any income planned to be received in the coming year by the applicant or a member of his household. 7 C.F.R. § 1944.2(c). Pensions, social security, welfare, unemployment benefits, and child support payments are included in the income calculation. *Id.* at § 1944.8(c)(2)(iv)(8)(v). The Section 502 program authorizes direct loans, not grants, therefore the applicant must demonstrate repayment ability under the regulatory standards. *Id.* at § 1944.8(2).

---

**1.** FmHA regulations are found in 7 C.F.R. Parts 1800 and 1900. The regulations have been amended frequently in the past few years. The class is composed of present and future borrowers, therefore, both the past and the current regulations are implicated. Unless otherwise noted, any citation is to the current regulation.

If an applicant qualifies, a loan will be made if sufficient funds are available.[2] The loan may be in an amount equal to the entire purchase price of the home, 7 C.F.R. § 1944.17(a), and may be for a term up to thirty-three years. *Id.* § 1944.25(c). The interest rate on the loan is based on the cost of funds to the government. 42 U.S.C. § 1490a(a)(1)(A); 7 C.F.R. § 1944.25. A home purchased or constructed with a Section 502 loan must conform to the regulatory specifications and will generally be a very modest home. 7 C.F.R. § 1944.11–16. This complies with the legislative purpose in the Housing Act to develop efficient and economical construction methods while alleviating the inadequate housing problem. S.Rep. No. 84, 81st Cong., 1st Sess., *reprinted in* 1949 U.S.Code Cong. & Ad. News 1550, 1551.

The mortgage note is standardized. 7 C.F.R. § 1807; *see id.* § 1944.33(c). All borrowers agree to many of the usual covenants in a commercial mortgage. By signing the note, the mortgagors agree to nonjudicial foreclosure in a provision commonly known as a "power of sale." Although Alabama law authorizes the use of non-judicial foreclosure, whether or not a power of sale clause is contained in the note, *Ala.Code* § 35–10–3 (1982), in this case the FmHA relies on Alabama Code Section 35–10–1 which permits non-judicial foreclosure when a power of sale is included in the note. The FmHA uses non-judicial foreclosure in approximately twenty states; in all other states, according to state law, mortgages must be foreclosed in a judicial proceeding. The manner of foreclosure is the crux of appellants' equal protection claim.

After a loan is made, an extensive regulatory scheme prescribes the manner, type and frequency of loan servicing. 7 C.F.R. § 1951. The regulations are designed to help borrowers meet their notes and to assure accurate administration of the loans. Two provisions, "interest credit"

and "moratorium" relief are designed to help a low-income borrower through a fixed period of time during which he is unable to meet the mortgage obligation. The interest credit subsidy reduces the interest rate paid on the mortgage in a proportion to the borrower's income. 7 C.F.R. § 1944.34. Interest credit agreements may be entered into at the loan closing or at some later date in response to changes in the borrower's income. An interest credit subsidy has the immediate effect of reducing the amount of each monthly payment and thus perhaps, allowing the homeowner to keep his property. Administration of the interest credit subsidies is charged to the Secretary of Agriculture ("Secretary") who "may" provide this relief. 42 U.S.C. § 1490a(a)(1)(B). Most of the appellants were given interest credits.

The Act also authorizes moratoria. 42 U.S.C. § 1475. The statute contemplates that the Secretary promulgate regulations that provide for a complete suspension of interest and principal payments during a period when the borrower is unable to make payments "without unduly impairing his standard of living" and "due to circumstances beyond his control." *Id.* In cases of extreme hardship, the Secretary is also authorized to cancel interest that accrues during the moratorium period. *Id.* The moratorium is just one of many work-out plans, e.g., interest credit, reamortization, and repayment agreements, that are prescribed to help a borrower through a financially difficult time. *See* 7 C.F.R. § 1951 Subpt. G. The moratorium "shall" be granted if a qualifying borrower applies. *Id.* § 1951.313. Prior to December 9, 1981 the Secretary had promulgated 7 C.F.R. § 1951.17(2)(i) (1977) which additionally required that the borrower had had a good credit history prior to experiencing the hardship. This regulation was amended on December 9, 1981 to include only the two

---

**2.** Annual appropriation determine the funds available for FmHA loans. See, e.g., Pub.L. 97–370, Tit. II (December 18, 1982), which appropriates $3.261 billion for all FmHA housing programs under Title V of the 1949 Housing

Act. At oral argument it was asserted that FmHA in Alabama did not use all the funds allocated for the state in 1982. This further suggests that there are ample funds available.

statutory prerequisites for eligibility. 7 C.F.R. § 1951.313 (1983). All of the loans of the representative plaintiffs had been accelerated before the 1981 amendment.[3]

The FmHA county supervisor is responsible for servicing all Section 502 loans which includes the interest credit and moratorium provisions. *Id.* § 1951.307. Each step of the loan process is governed by regulation as detailed as a list of points to discuss in the initial application interview. Most communication, i.e., payments, late notices, acceleration notices, is done through prescribed forms. See 7 C.F.R. § 1951 Subpts. A & G. The county supervisor notifies each borrower of the moratorium provision when the supervisor becomes aware of a change in the borrower's circumstance and includes specific language informing the borrower of the moratorium provision in any collection letter sent after a payment is not made. *Id.* § 1951.312–.313. The regulations do not require that a borrower be given a moratorium application and none was dispensed by FmHA officials unless requested.

Moratoria may be granted in six month intervals, extendable up to three years. If after three years the borrower is unable to resume payments, foreclosure must proceed. *Id.* § 1951.313(4)(15). Although the first paragraph of § 1951.313 states that a moratorium *shall* be granted if the borrower meets the two statutory prerequisites in 42 U.S.C. § 1475 *infra*, Section 1951.313(2) requires that the borrower apply for a moratorium and authorizes the county supervisor to grant or deny the moratorium based upon a determination that no other work-out program would be adequate and that the appropriate documents reveal that payment would substantially impair the borrower's standard of living. Borrowers are notified of an adverse decision and informed of the administrative appeal process set forth in 7 C.F.R. § 1900 Subpt. B.

In 1978 Congress realized there was no real administrative appeals process for FmHA decisions under Section 502 loans. S.Rep. No. 871, 95th Cong., 2d Sess. 39–40, *reprinted in* 1978 U.S.Code Cong. & Ad. News 4773, 4812. Public Law 95–557, 42 U.S.C. § 1480(g) enacted in 1978, required the Secretary to adequately notify borrowers of the denial of moratoria and to promulgate an appeal procedure that allows borrowers to present additional information "to a person, other than the person making the original determination, who has authority to reverse the decision." Pursuant to this law, the Secretary published C.F.R. Part 1900 Subpt. B, 43 Fed.Reg. 219, Nov. 13, 1978 which provided for an informal hearing before an FmHA official who did not have an active role in servicing the borrower's account. 7 C.F.R. § 1900.57 Exh. D. The borrower must initiate the appeal process as there is no automatic review. The hearing may be tape-recorded at the appellant's expense, and an FmHA designate must take "notes" of the hearing. *Id.* § 1900.57(d).

If the hearing officer upholds the FmHA action taken, the appellant then has thirty days in which to request in writing that the hearing officer's decision be reviewed. *Id.* 3(j). If a request for review is filed, a reviewing officer (one for each state) will

---

**3.** Before 1981, the regulations additionally required that the borrower had "paid real estate taxes, property taxes, property insurance and loan payments when due." 7 C.F.R. § 1951.-17(b)(2)(1)(A) (1980). This additional requirement of a good credit history was not authorized in the statute and was therefore deleted. Many of the plaintiff class borrowers were affected by its provisions and it will pose a factual question at trial. The additional requirement could work to a borrower's disadvantage if a moratorium was not granted at the first sign of trouble. If FmHA personnel attempted other work-out solutions that perhaps gave some interest credit or altered the repayment schedule and the borrower was unable to meet the work out plan then he would have a bad credit history. The bad credit history would be a reason for denying the moratorium when it was finally considered. Whereas, had the FmHA's first work-out solution been a moratorium, it could have prevented the development of a bad credit history. By not granting a moratorium initially, the FmHA allowed borrowers to create bad credit histories and then used those bad credit histories as a reason to deny the moratorium once the situation had gotten crucial. *Cf. Allison v. Block,* 723 F.2d 631 (8th Cir.1983) (Secretary's discretion under CFRDA should be governed by substantive regulations).

examine the hearing officer's decision in light of the record. *Id.* § 1900.58. The reviewing officer's decision concludes the administrative appeal process and, if it upholds the FmHA action, will be retroactively effective on the date the original action was taken. A "notice of acceleration," sent to all borrowers to notify them of the FmHA plan to foreclose, also informs a borrower of the right to appeal and triggers the appeal process.

The decision to foreclose is made by the county supervisor and approved by the State Director before foreclosure is begun. In Alabama, foreclosures are done by notice to the homeowners of a repossession date and the planned sale. Unless the homeowner does not voluntarily vacate the house, in which case a judicial eviction would be filed, no judicial process is used. The FmHA appeal process is available to borrowers whether judicial or non-judicial foreclosure is contemplated. In states that require judicial foreclosure, after the FmHA appeal is completed, a lawsuit is filed by the FmHA requesting foreclosure. Before a court orders foreclosure, the FmHA must prove that it followed all applicable rules and procedures in accelerating the homeowner's loan. Thus, there is a substantial procedural advantage to borrowers who are foreclosed through the judicial process.

FACTS

*Gabriel Johnson*

In 1972, Gabriel Johnson borrowed $13,000 under the Section 502 program to purchase a house in Monroeville, Alabama. An interest credit was granted at the time of the original loan that made her monthly note payments forty-eight dollars. In 1974–77, similar interest credit pegged her monthly bill at forty dollars. In 1977, Mrs. Johnson was informed that the interest credit agreement would soon expire and was requested to supply information necessary to renew the subsidy. (D.Ex. 13). Mrs. Johnson did not supply the information and on March 15, 1978 her payments increased to the unsubsidized amount of eighty-nine dollars per month. Mrs. John-

son then supplied the information needed to process interest credit but was denied such credit due to "ineligibility" on April 17, 1978. Both the letter informing Mrs. Johnson of the increased payment amount and the letter denying interest credit stated that Mrs. Johnson could appeal these decisions. She did not appeal.

Mrs. Johnson's repayment record was poor. Her account was accelerated in 1975 but she was able to pay the delinquency and retain her home. Between March 1976 and July 1977 she was sent thirteen notices of delinquency. Between April 1978 and the April 1980 acceleration she was sent five delinquency notices.

Mrs. Johnson failed to make the eighty-nine dollar monthly payments. A Notice of Acceleration advised Mrs. Johnson she could challenge the planned foreclosure in an administrative hearing. Mrs. Johnson did not ask for such a hearing and moved out of her home two days prior to the non-judicial foreclosure on July 31, 1980. Mrs. Johnson and her family now live in a house without heating or indoor plumbing. Her former home is empty, awaiting resale among FmHA's inventory of homes.

Mrs. Johnson is a fifty-five year old grandmother. Numerous members of her extended family lived with her in the FmHA-financed house. She contends that she was improperly denied interest credit in 1978 because the household income was erroneously calculated. Specifically, she maintains that the FmHA included in the income projection child support that should have been paid to Mrs. Johnson's oldest daughter but in fact was never received and that the FmHA calculated Mrs. Johnson and her daughter's incomes based on full-time employment when in fact both women were unemployed or underemployed during this period.

Mrs. Johnson contends that the power of sale clause in the mortgage note is not valid because she did not understand its meaning. At closing, in compliance with FmHA procedure, Mrs. Johnson was represented by an attorney chosen by her from a list supplied by FmHA. The record indi-

cates that the attorney did not explain the power of sale clause to Mrs. Johnson. Expert testimony at the hearing on the preliminary injunction revealed that Mrs. Johnson has a third grade reading level and that the FmHA note could only be comprehended by a person with at least a college education and one year of graduate study. Finally, Mrs. Johnson asserts that because of the geographical happenstance that she is an Alabama resident, she was denied equal protection by the non-judicial foreclosure. Had a judicial foreclosure been done, the FmHA's servicing of her account would have been reviewed.

### Phyllestine Lowe

Mrs. Lowe and her husband took a Section 502 mortgage in 1972. The mortgage was non-judicially foreclosed in November, 1980. After foreclosure, pursuant to FmHA procedure, the government demanded possession. A refusal to surrender possession forfeits the borrower's right to redemption and prompts the FmHA to bring an ejectment action. Mrs. Lowe did not surrender possession. Instead she filed motions for a temporary restraining order and to intervene in this lawsuit. The FmHA agreed to allow Mrs. Lowe to retain possession of the house pending this lawsuit and she is making monthly note payments to the court.

Mrs. Lowe's complaints are similar to Mrs. Johnson's. She contends that the standard notice of moratorium and interest credit relief are inadequate, that she was not informed of the right to appeal denials of such relief and that interest credit relief was improperly denied based on an erroneous calculation of her income. Mr. Lowe moved out of the house in 1976. He paid no child support for their two children until the local court ordered him to pay one hundred dollars per month in 1978. In late 1976, Mr. and Mrs. Lowe applied for interest credit and were refused due to insufficiently low income. (Lowe Dep., Def.Ex. 7). After Mr. Lowe left, Mrs. Lowe experienced financial troubles and claims that she was told that according to FmHA regulations interest credit was not available be-

cause her husband's income would be included in the calculation until they were divorced. 7 C.F.R. § 1944.8(c)(1)(VI) includes a spouse's income unless papers of separation or divorce have been filed or the couple has lived apart at least six months. In March 1978, Mrs. Lowe was in fact granted an interest credit based upon her income alone. (Lowe Dep., Def.Ex. 8).

### Earnestine Marshall

In 1979, Earnestine Marshall and her former husband purchased a home with a Section 502 note. In October, 1980 the couple divorced and Mrs. Marshall learned that the house note payments were behind. Mrs. Marshall was underemployed and therefore ineligible for unemployment benefits and her husband was seldom making the court ordered child support payments for their three children. The Marshalls' note was heavily subsidized by interest credit at its inception and required monthly payments of eighty-seven dollars. The parties do not agree who initiated the suggestion, but as a "work-out" solution to the delinquency, Mrs. Marshall agreed to pay eight-eight dollars each week until the delinquency was paid. She made some payments under this Repayment Agreement but never completely caught up.

In September, 1981, the interest credit agreement came up for renewal. In re-calculating the amount of interest credit, FmHA personnel assumed Mrs. Marshall would be fully employed and that she would receive all child support payments. The effect of this was to reduce her interest credit, thereby increasing her monthly payment to $120. Mrs. Marshall signed the new interest credit agreement. FmHA seeks to use her assent as a bar to challenging the income calculation. In the notice of increase sent to Mrs. Marshall, the FmHA also informed her that this decision was not appealable. 7 C.F.R. § 1900.-53(a)(7) (1982).

Mrs. Marshall's home was non-judicially foreclosed in October, 1981. She appealed the decision. A District Director upheld the FmHA action. This adverse decision was also upheld on review. In April, 1982

Mrs. Marshall intervened in this lawsuit. She is still in possession of her home and has been ordered to make monthly payments to the court.

*Mr. and Mrs. Young*

Mr. and Mrs. Young are both handicapped. Each has had one leg amputated and suffers from other ailments. They complain that they were unable to climb the stairs in the FmHA office to tender payment and that FmHA personnel refused to meet with them in the ground floor lobby. The Youngs also assert that the Camden County FmHA Supervisor informed them in November 1980 that they would receive additional interest credit and thus reduce their monthly payments to thirty-six dollars. No such interest credit was granted and in February, 1981 the Youngs were $588 behind in their payments. The Youngs claim that they attempted to pay this money through a messenger to the Camden office but it was not accepted. The Youngs claim that they were told foreclosure had begun and would only be stopped if they paid $800. They claim that they attempted to pay this amount in Camden and in Montgomery at the state office but no one would accept it or assist them. Their home was non-judicially foreclosed and an action for ejectment was brought. That action, and a cross motion for temporary restraining order, were consolidated with this class suit. The magistrate made no findings of fact about the Youngs' allegation. Their case was added to the class on May 25, 1982, six weeks before the hearing on this motion for preliminary injunction. No evidence about the Youngs' case was presented at that hearing, therefore we do not evaluate the specific facts, but will include them in the discussion of the class' equal protection and due process claims.

## PRELIMINARY INJUNCTION STANDARD

■ When ruling on a motion for a preliminary injunction, the district court must examine four factors:

(1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest. (citations omitted).

*Canal Authority of Florida v. Callaway,* 489 F.2d 567 (5th Cir.1974). *Accord, United States v. Lambert,* 695 F.2d 536 (11th Cir.1983); *Southern Monorail Co. v. Robbins & Myers, Inc.,* 666 F.2d 185 (5th Cir. Unit B 1982).

The United States magistrate found that granting the injunction in this case would not serve the public interest. In support of this ruling, the magistrate found that it cost the government $450 per month to maintain each of the 583 homes it had in inventory. To enjoin resale would cost the government $250,000 each month and would prevent recycling the expected sale proceeds to other Section 502 borrowers. The magistrate found that ejectment was a substantial injury but found that the government could respond in damages if the ousters were found erroneous. The magistrate concluded that the balance of equities militated against granting the injunction. The magistrate found that the plaintiffs had not shown irreparable injury because the government could respond in damages and *lis pendens* that were filed may enable appellants to get their homes back if they succeed on the merits. Finally, the magistrate concluded that appellants are not likely to succeed on due process and equal protection claims and that the regulations were either followed or their violation was *de minimus.* The district judge adopted these recommendations by the magistrate. Our review of this order will determine if the district court abused its discretion in denying the preliminary injunction. *United States v. Lambert,* 695 F.2d 536, 539 (11th Cir.1983).

## 1. LIKELIHOOD OF SUCCESS ON THE MERITS

(a) Due Process

We begin our discussion of the merits with a reminder that we are only discuss-

ing the "likelihood" of success. *See University of Texas v. Camenisch,* 451 U.S. 390, 394, 101 S.Ct. 1830, 1833, 68 L.Ed.2d 175 (1981). Our ruling on the preliminary injunction, as with the district court's fact finding at the preliminary stage, has no conclusive bearing at the trial on the merits. The first issue is whether the use of non-judicial foreclosure meets the minimum requirements of due process.

■ A FmHA loan, once made, creates a statutory entitlement and a property interest protected by the due process clause of the Fifth Amendment. *See Goldberg v. Kelly,* 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970); *United States v. Henderson,* 707 F.2d 853, 857 (5th Cir. 1983); *McCachren v. United States Dep't. of Agriculture,* 599 F.2d 655, 656 (5th Cir. 1979). *See also Neighbors v. Block,* 564 F.Supp. 1075 (E.D.Ark.1983); *United States v. Ford,* 551 F.Supp. 1101 (N.D. Miss.1982); *Rau v. Cavenaugh,* 500 F.Supp. 204 (D.S.D.1980); *United States v. White,* 429 F.Supp. 1245 (N.D.Miss.1977); *Ricker v. United States,* 417 F.Supp. 133, (D.C.Me.1976); *Law v. United States Dep't. of Agriculture,* 366 F.Supp. 1233 (N.D.Ga.1973). At a minimum, due process assures notice and a meaningful opportunity to be heard before a right or interest is

forfeited. *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976); *Fuentes v. Shevin,* 407 U.S. 67, 80–83, 92 S.Ct. 1983, 1994–1995, 32 L.Ed.2d 556 (1972); *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969).

■ It seems that all plaintiffs have been repeatedly receiving notice of the right to apply for a moratorium in each past due notice mailed.[4] Further, it appears that adequate notice of the appeal procedures and of pending acceleration or foreclosure have been given. The notice required by regulation meets the due process standard. Any deviations from the notice regulations that might constitute a due process violation are left to the factfinder at the trial on the merits.[5]

■ The second due process requirement, a meaningful opportunity to contest an adverse decision or action, is more problematic. A fair hearing requires an impartial arbiter. *See Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242–243 & n. 2, 100 S.Ct. 1610, 1613 & n. 2, 64 L.Ed.2d 182 (1980). We have serious reservations about the neutrality of the hearing officers. The regulations establish that the hearing officer is a nearby district director. On its face, the regulation appears less than neutral.

---

**4.** For example, Mrs. Johnson was notified of the moratorium availability on February 26, 1980, March 21, 1979, April 3, 1979, and May 15, 1979. The standard letter includes a notice of delinquency and the following language about the availability of moratorium relief: "You may be interested in knowing that you may apply for a moratorium on payments if, due to circumstances beyond your control you are unable to continue making scheduled payments on your rural housing loan account without unduly impairing your standard of living. Some of these circumstances are: Loss of your job or sudden reduction of income expenses due to injury, illness, or death in the family; or under certain conditions, in cases of separation, when your spouse is living apart from the family and the FH financed dwelling." Letter of April 3, 1979, R.Vol. 2 at 258.

The plaintiff class argues that FmHA personnel should automatically disperse a moratorium application to assure that all borrowers are considered for moratorium relief whether or not they apply. The regulations do not require this and we have no evidence that requiring the

borrowers to ask for an application is onerous. Unless, of course, evidence is adduced that shows FmHA personnel deliberately underplay the moratoria relief provisions. On this issue, a report prepared by an FmHA regional inspection team indicates that FmHA personnel in Alabama need additional training in the use of partial payment plans and moratoria because these work-out remedies were being underutilized in Alabama. Assessment Review Team Report, (Alabama, February 2–6, 1981), R.Vol. 3 at 587.

**5.** Whether the borrowers understand the notices is also left to trial on the merits. The regulations afford many other due process protections beyond notice and a hearing. For example, a borrower has the right to present evidence, cross-examine witnesses, and to have counsel or other representation at the hearing. Because these additional protections are afforded in the regulations, we do not reach the *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), question of what process is due.

The nearby district director will be evaluating a decision to foreclose made by a peer and already approved by his boss, the state director. (Sirmon Dep. at 59–60). The Supreme Court in *Schweiker v. McClure*, 456 U.S. 188, 195, 102 S.Ct. 1665, 1669, 72 L.Ed.2d 1 (1982) has stated that hearing officers are presumed to be unbiased until a conflict of interest or other specific reason for disqualification is shown. It is the plaintiff's burden of proof to show a conflict of interest. *Id.* at 196, 102 S.Ct. at 1670. At trial, the plaintiffs may be able to further demonstrate a conflict of interest in the hearing officers. On the surface, the plaintiffs have shown a substantial likelihood that a conflict may exist that would impinge the hearing officer's impartiality.

In their brief plaintiffs also contend that a memorandum of May 20, 1982, from Neil Sox Johnson, Acting Deputy Administrator, adds an additional review by the Deputy Administrator of any hearing officer's reversal of FmHA actions. Thus if a borrower prevails, then the FmHA will get an additional appeal not available when the borrower loses the hearing. This memorandum does not comport with agency rulemaking authority and also suggests due process violations. Mr. Johnson has filed an affidavit indicating that this procedure is designed to assess the need for training among hearing officers. The district court has made no findings. The memorandum at least poses a substantial question.

*The Power of Sale*

The FmHA has made approximately one million housing loans. Its standard form includes a power of sale that authorizes non-judicial foreclosure in the event of default. This is permitted by Alabama Code § 35–10–1 (1980). In its brief, the FmHA makes a confusing statement concerning Alabama law and the use of non-judicial foreclosure. In fact, Section 35–10–1 permits such foreclosures *if* the underlying instrument contains a power of sale. If judicial processes were used instead, a full court proceeding would automatically be conducted before foreclosure. A valid power of sale is necessary to foreclose under Section 35–10–1.[6]

■ The FmHA argues that there is no right to judicial foreclosure, but only a right to due process which the FmHA claims is met through their procedure which is functionally equivalent to a judicial foreclosure. It is true that there is no absolute right to judicial foreclosure; however, if these mortgages did not contain a power of sale FmHA would foreclose through a judicial process. Additionally, if a judicial foreclosure is the only avenue open, a hearing will occur *automatically*, unlike the FmHA procedure which requires the borrower to initiate the hearing.[7] Pretermitting whether the FmHA hearing and appeal procedure meets due process, a pow-

6. Alabama Code § 35–10–3 does authorize nonjudicial foreclosures when the underlying instrument contains no power of sale provision. But the FmHA is not relying on this provision of the Alabama Code, probably because it presents serious due process problems when there has been no valid waiver of the right to notice and a hearing. *See Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 1983 (1972); *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969).

7. There is no right to non-judicial foreclosure, only a right to due process. Therefore, if the FmHA procedure affords due process a validly executed power of sale provision is not constitutionally required. A judicial foreclosure proceeding gives the borrower more rights than the FmHA appeal and hearing process. Judicial proceedings would occur automatically, would be before a federal magistrate or district judge, and would have lawyers representing both sides. Additionally, the burden of proof in a judicial proceeding is on the FmHA to show that they followed all applicable rules and regulations and that the borrower is in default. In an FmHA proceeding the burden of proof is on the borrower to show that the FmHA acted in error. Because a judicial foreclosure gives the borrower these additional protections not available in the FmHA proceeding, when a borrower signs the power of sale provision he is waiving the right to certain processes. Even if we find that the FmHA's procedure meets the due process minimum, borrowers are waiving other processes in the power of sale. Due process requires only an opportunity for a hearing whereas judicial foreclosure requires the hearing. *See Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Cf. United States v. Ford*, 551 F.Supp. 1101 (N.D.Miss.1982).

er of sale clause at least waives the automatic nature of the review. We therefore examine the validity of the power of sale clause in the standard mortgage note.

■ Due process rights may be waived, *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 185, 92 S.Ct. 775, 782, 31 L.Ed.2d 124 (1972), although there is a strong presumption against waiver. *Gonzalez v. County of Hidalgo*, 489 F.2d 1043, 1046 (5th Cir. 1973). Waiver depends upon the facts of a particular case, *United States v. Wynn*, 528 F.2d 1048, 1050 (5th Cir.1976), and is good only if it is done in an informed manner. *Overmyer, supra* 405 U.S. at 186–87, 92 S.Ct. at 782–83.

Plaintiffs introduced an expert witness who testified that the standard FmHA mortgage, containing the power of sale, requires five years of college to understand. The expert tested the named plaintiffs and found their reading levels were substantially below that required to understand the document. The expert testified that most members of the class would be unable to comprehend the FmHA documents. Earnestine Marshall testified that she did not even read the documents.

The plaintiffs also contend that their relative bargaining position with FmHA makes these contracts adhesive. This inequality is allegedly exacerbated by the standardized mortgage used in all FmHA loans. *See Gonzalez*, 489 F.2d at 1046–47. The FmHA is a large agency and practical considerations require that a standard mortgage be issued. On the question of unequal bargaining positions, we note that the FmHA has each borrower select an

attorney from a list it provides. That attorney is present at the closing to look after the borrowers' interests. No evidence has been offered to show what the attorneys present at the closings did as to explaining the power of sale provisions to the borrowers.[8] We simply cannot determine on this record whether a knowing and intelligent waiver has been made. This will be resolved by the trial court in the first instance.

Some district courts have found that the FmHA failed to prove that the plaintiffs knowingly and voluntarily agreed to the power of sale provisions. *See Rau v. Cavenaugh*, 500 F.Supp. 204 (D.S.D.1980); *United States v. White*, 429 F.Supp. 1245 (N.D.Miss.1977). Our precedent requires specific proof of a knowing and voluntary waiver of the constitutional right to due process. *Gonzalez v. County of Hidalgo*, 489 F.2d 1043, 1046 (5th Cir.1973). At the trial on the merits this will be a substantial question of fact.

We conclude that there is a substantial likelihood that the plaintiffs will prevail on the merits of their due process claims.

(b) Equal Protection

Plaintiffs contend that the FmHA's use of judicial foreclosure in thirty jurisdictions denies equal protection to those residents of the twenty-two jurisdictions in which the FmHA uses non-judicial foreclosure. The FmHA determines the method of foreclosure based on the law of each state or jurisdiction. On its face, the distinction between types of foreclosure is made by an external neutral factor: the law of the

---

**8.** Our precedent indicates that the borrowers must understand what they are waiving. If the attorney present at the closing is representing only the borrower's interests we would be reluctant to hold that the FmHA has the duty to explain the power of sale provision. Such an explanation should more properly come from the attorney present who is representing the borrower's interests. Conflict of interests might taint any explanation given by FmHA personnel. The question of the ability of FmHA borrowers to understand the documents they are signing or reading can easily be taken too far. At oral argument, counsel for the borrowers stated that they were not arguing that these documents can never be understood by the borrowers only that they were not understood. Lack of sufficient reading level to understand business transactions should not preclude persons from entering the contract. Nor can we require the FmHA to educate all borrowers to a degree necessary to understand the contract. A practical balance needs to be struck between careful and reasoned explanation of the terms and an absolute understanding requirement that would ultimately preclude many borrowers from the program which is designed to serve them. A positive step to solve the dilemma was made by assuring that an attorney represent the borrower's interests at closing.

state. We do not doubt that using the law of the situs of real property is a rational reason for the jurisdictional distinctions between foreclosure methods.

Plaintiffs demonstrated the importance of the distinction between methods of foreclosure with statistical evidence that suggests a correlation between the use of nonjudicial foreclosure and more frequent foreclosure and less frequent issuance of moratoria. The FmHA contends there is no correlation between these factors. It states that the reason for using non-judicial foreclosure is the very rational and practical consideration that it is less expensive.

■ Our equal protection analysis is somewhat novel in that it involves a federal agency treating a class of persons, defined only by geography, differently from another geographically defined class. The government suggests in its brief that "(s)ocial and economic legislation that does not employ suspect classification or impinge on fundamental rights must be upheld ... when the means are rationally related to a legitimate government purpose." *Hodel v. Indiana,* 452 U.S. 314, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981); *Schweiker v. Wilson,* 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981). We agree with this statement of the law and perhaps could uphold the use of non-judicial foreclosure if it were determined only by reference to state law.

The Rural Housing Act is a national program; however, there is no federal law of foreclosure as none was created in the Act. In *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), the Supreme Court addressed an analogous question of lien priority under federal loan programs. There, as here, Congress had not spoken on the lien priorities. In *Kimbell,* the Court first decided that federal law governs federal loan programs and that in the absence of applicable federal law the courts must fashion the rule of law. *Id.* at 726, 99 S.Ct. at 1457, *quoting, Clearfield Trust Co. v. United States,* 318 U.S. 363, 366–67, 63 S.Ct. 573, 574–75, 87 L.Ed. 838. *See Gunter v.*

*Hutcheson,* 674 F.2d 862, 868–69 (11th Cir.) *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). In deciding whether to adopt state law as the substance for the federal rule it was fashioning, the Court inquired into: the nature of the federal program and its need for national uniformity; whether the application of state law would frustrate specific objectives of the federal program; and the extent to which application of a federal rule would disrupt commercial relationships predicated upon state law. *Id.* 440 U.S. at 728–29, 99 S.Ct. at 1458–59. We perceive no need for national uniformity in the method of foreclosure on these FmHA housing loans. State law does not really frustrate any specific policy in the Act, unless it erroneously prematurely evicts a borrower from his home. In that case the overall goal of decent housing is frustrated. Finally, because real property is governed by the law of its situs, any federal rule would have to conform to state laws otherwise the foreclosures would create good title problems.

■ Although there is no federal rule of foreclosure, if FmHA were to foreclose all homes through a judicial process we can only presume this would comply with state law. In *Kimbell* the Court adopted state law as the federal rule. At this stage in the case, with the limited record before us, we consider that using state law to determine a method of foreclosure is a reasonable choice of law decision that does not thwart any federal policy. Nor does it matter that FmHA chose the power of sale in the mortgage note as a means to trigger non-judicial foreclosure from among the alternative methods of foreclosure available in Alabama.

We do not think that the choice of law question raises an equal protection claim. We have one reservation. The consent decree entered into by the FmHA in Georgia in *Williams v. Butz,* No. CV–176–173 (Oct. 7, 1979) (S.D.Ga.), provides that notwithstanding that Georgia law permits non-judicial foreclosure, henceforth all FmHA loans in Georgia shall be foreclosed through the judicial process. By this ac-

tion, the FmHA has gone beyond the original choice to use non-judicial foreclosure in the states that permit it. The FmHA has voluntarily granted Georgia residents an additional procedure not available to residents of the other twenty-two states that allow non-judicial foreclosure. It is permissible for a federal agency to use state laws if the laws further the policy of the federal program.[9] We question whether the use of non-judicial foreclosure furthers the policies of the Housing Act.

This issue was raised by the court *sua sponte* during oral argument. At that time the attorney for the FmHA frankly stated that the consent decree was entered into in *Williams* to appease District Court Chief Judge Anthony Alaimo who was outraged about the FmHA foreclosure practice in Georgia. Without discounting the tenacity of an extraordinary jurist, we feel comfortable in assuming that this reason does not rise to the rational purpose test the government concedes it must meet. We requested that the parties brief this issue after oral argument. In its brief, the FmHA asserts that the *Williams* consent decree was entered into because a similar action had been adversely decided in Mississippi at the time which argued poorly for their chances of success in Georgia. *United States v. White*, 429 F.Supp. 1245 (N.D.

Miss.1977). The FmHA was also motivated by the backlog of mortgages in arrears in Georgia and was concerned that a hiatus of foreclosures for all members of the certified class in *Williams* would result in an administrative nightmare. We note that in this case *lis pendens* have been filed on all houses and that the same administrative nightmare could occur. Finally, the FmHA points out that *Williams* and *White* were decided before the FmHA had issued its hearing and appeal regulations in 1978 and that a different and perhaps more serious due process challenge was motivating the settlement.[10] The FmHA offers no reason for its failure to request a modification of the *Williams* consent decree in light of the regulatory changes. Perhaps Judge Alaimo is still an intimidating presence—if so it is an interesting footnote to notions of separation of power.

The geographic class of persons against whom the FmHA uses non-judicial foreclosure was not defined by Congress. Congress has not spoken to the manner of foreclosure. The FmHA has decided that it will foreclose non-judicially whenever permitted with the exception of Georgia. Our review here will not opine resolution of this issue because we have no real record and little legal argument to guide us. We do conclude that the plaintiffs have more

---

**9.** Whether state or federal law will apply to govern questions arising under FmHA loan programs has produced some interesting results. As the Supreme Court said the question is "dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 *quoting, United States v. Standard Oil Co.*, 332 U.S. 301, 310, 67 S.Ct. 1604, 1609, 91 L.Ed. 2067 (1947). *See United States v. Med O Farm, Inc.*, 701 F.2d 88 (9th Cir.1983) (Washington law of no due-on-sale provisions would not be applicable to 7 U.S.C. § 1946 loans because of the national need for uniformity.); *United States v. Allen*, 699 F.2d 1117 (11th Cir.1983) (FmHA sought injunction to prohibit non-judicial foreclosure of a property on which it was the junior lienor, held that the FmHA had no right to notice under Georgia law and that the injunction should not have issued).

**10.** Since *White*, the United States District Court for the Northern District of Mississippi has approved the FmHA's new hearing and appeal procedure. *United States v. Ford*, 551 F.Supp. 1101 (N.D.Miss.1982).

In its letter-brief the FmHA offers reasons to sustain the consent decree against an equal protection challenge. The consent decree in *Williams* is not before this court and therefore is not challenged. The issue is whether by voluntarily consenting to the use of judicial foreclosure in Georgia the FmHA denies equal protection to Alabama residents by not affording them the same procedure. Only one case on point has been cited to this panel, *Sundheimer v. Blum*, 79 App.Div.2d 512, 433 N.Y.S.2d 456 (1980), *aff'd. mem.*, 55 N.Y.2d 756, 447 N.Y.S.2d 245, 431 N.E.2d 970 (1981). We note the policy reasons that encourage settlement of such lawsuits may not be served by finding a collateral equal protection effect from the consent decree. But all of these questions are more properly addressed at trial.

than a possibility of prevailing on the equal protection question defined at oral argument.

(c) Application of the Regulations

Plaintiffs contend that FmHA is not always following the regulations that govern loan servicing. Mrs. Johnson contends that she was not properly informed of her right to apply for interest credit, to appeal an adverse decision and to apply for moratorium. We noted earlier that generally the FmHA is very good about notifying its borrowers about these matters, and our reading of the record suggests that Mrs. Johnson was given repeated notice of her rights. There is a question of the borrower's ability to understand the notice that informs them of the right to apply for moratorium relief. There is some evidence that while the specific meaning of moratorium may not be understood most borrowers knew that it was probably something that could help them. They could have at least inquired into the matter. Plaintiffs contend that FmHA personnel were delinquent in their duty to go see borrowers in trouble to help work out a repayment solution. The regulations do not require that each borrower automatically be considered for a moratorium so it is important that the borrower know to apply for this relief.

Mrs. Johnson, Mrs. Lowe, and Mrs. Marshall contest the method of calculation of their interest credit. The regulations authorize FmHA to project the income of a borrower for the coming year. The projected income is used to figure the amount of interest credit a borrower receives. A projection that overstates income has the immediate effect of increasing the monthly payments due out of proportion to the borrower's actual income. By regulation, the income projection is to include child support and other payments made on behalf of a minor. 7 C.F.R. § 1944.8(c)(1)(v). In practice the FmHA includes in the projection court-ordered child support payments that one may reasonably determine from prior payment history will not be paid. In the calculation of Mrs. Johnson's income the FmHA overstated the amount of child support she received by one hundred dollars each month.

■ The named plaintiffs also introduced evidence of overstated income projections based on FmHA assumptions of full employment when in fact a history of underemployment existed. The regulations could be clearer as to how projections should be made.[11] Regardless of whether the regulations can be construed to require the FmHA to include funds not likely to be received in its projections or whether the FmHA is deviating from the regulatory plan, the calculations appear to be very poor and inaccurate. Fundamental notions of fairness protect the borrower from an erroneous calculation of his income that would preclude interest credit. *Cf. United States v. Henderson*, 707 F.2d 853 (5th Cir.1983) (FmHA foreclosure notice that misstates Mississippi law offends fairness).

The district court found that any deviation from the regulations was *de minimus*. We disagree as these income calculations have significant economic impact. In fact, this error alone may be the "substantial prejudice" needed to obtain relief from a denial of due process in an administrative proceeding. *United States v. Lober*, 630 F.2d 335 (5th Cir.1980). At trial, the FmHA will have to prove the reasonableness of their income projections.

2. THE PUBLIC INTEREST

The district court's conclusion that granting the injunction would disserve the public interest is not supported by the record. The cost estimate of $450 per house per month, for a total of $250,000 each month to maintain the houses in inventory defies common sense. Judges, as homeowners, are generally aware that a 1200 square

---

**11.** The regulations do not instruct FmHA personnel to use court ordered amounts of child support in making the income projections. In other portions of Section 1944.8, "known facts or historical data" are to be considered but no such language clarifies the projection of child support payments. The question of computation of projected income will involve a detailed analysis of the reasonableness of the FmHA projections.

foot home does not cost $450 each month to maintain—the yardwork is not that substantial and painting costs cannot be that high. This figure was adopted from the testimony of Rufus Sirmon, Chief of the FmHA Rural Housing Section in Alabama. Mr. Sirmon was testifying without data before him. On cross-examination, Mr. Sirmon explained that the $450 figure was the total carrying cost to the FmHA [12]. He admitted that even if the houses were sold, the best that the government could expect to receive from a buyer was $350–400 per month. Hearing T. at 16. The magistrate's recommended order alternatively found that the government's carrying costs are $125,000 "out-of-pocket" each month. There seems to be an inconsistency in this factual premise.

The magistrate also found that the failure to resell these homes would disserve the public interest by not recycling the funds to other purchaser/borrowers. Mr. Sirmon testified that he understood that Washington had "plenty of money, funds, at this time" for Section 502 loans. Id. at 25. When asked why the FmHA did not therefore place potential borrowers in homes, Mr. Sirmon responded that "if you've got twenty percent delinquency in a county and thirty or forty inventory properties and you go and build thirty or forty more houses, you can flood the market and wind up with the government having thirty or forty empty houses after this is all settled, and we can't do that." Id. at 25–26.

The cost to the government "alone" was considered reason to deny the preliminary injunction as being against the public interest. When enacted, the legislative purposes of the Housing Act of 1949 included providing adequate housing and alleviating housing shortages. S.Rep. No. 84, 81st Cong., 1st Sess., reprinted in 1949 U.S. Code Cong. & Ad.News 1551, 1559. Congressional intent and statutory purpose can be taken as a statement of public interest. Our reading of the magistrate's recommended order suggests that he gave little attention to the public interest manifested in this social welfare program.

In the abstract, the magistrate's conclusion that granting the injunction would reduce the availability of Section 502 loans is persuasive. However, the FmHA acknowledges that funds are available if it chooses to employ them so we are not persuaded that granting the injunction disserves the public interest. To the contrary, the public is served when social welfare laws are implemented as evidenced by the policy in the Act. Premature foreclosures clearly disserve the Act's purpose of providing decent housing.

### 3. COMPARATIVE HARM

The district court found that the harm to the FmHA if the injunction were granted outweighed the injury to the plaintiff class. As we noted earlier, the FmHA apparently has sufficient funds to continue its program without recycling the inventory homes. The lis pendens on these houses, and the extraordinary FmHA action of selling them over the lis pendens may create more hardship on the government than if it simply judicially foreclosed each house. This situation is much like that in Georgia in 1977 when the FmHA voluntarily agreed to judicially foreclose to avoid the administrative burden posed by the lis pendens. In thirty jurisdictions the FmHA uses only judicial foreclosure. Having Alabama conform to the majority during the pendency of this lawsuit does not seem to be a substantial burden. We acknowledge that the judicial foreclosures will cost the government more money, but this monetary burden is different in degree and kind from that of the plaintiff class members.

Possibly wrongful eviction from one's home is a serious injury. It is well recognized that real property is unique and not fungible. A person's home has even more intangible value. The whole family is uprooted and displaced. In the case of these plaintiffs, other adequate housing is often not available. They qualified for the Section 502 home loans in the first place by demonstrating that no commercial lender

---

12. At oral argument, counsel for FmHA stated that the monthly carrying costs estimated included insurance, taxes, principal and interest as well as maintenance.

would extend them a loan. We are convinced that the relative harm to the government from granting a preliminary injunction pales when compared to the serious injury class members suffer when they are forced from their homes.

### 4. IRREPARABLE INJURY

The district court found that plaintiffs would suffer no irreparable injury because the government could respond in damages. *United States v. Perry*, 706 F.2d 278 (8th Cir.1983), held that an abuse of process action for monetary damages against the FmHA is barred by sovereign immunity. Thus there is at least a serious question of the FmHA's ability to respond in damages. This issue was apparently not raised or considered by the district court.

■ Aside from the issue of damages, irreparable injury is suffered when one is wrongfully ejected from his home. Real property and especially a home is unique. These plaintiffs suffer irreparably if they must live in inadequate, often health endangering housing for any period of time as a consequence of a wrongful ejectment. The FmHA is selling these houses over the *lis pendens*. The rightful owners will incur additional delays in repossession of their homes in the event they prevail on the merits. We conclude that the plaintiffs would suffer irreparable injury from the denial of the preliminary injunction.

### CONCLUSION

■ We find that the district court abused its discretion by denying the motion for a preliminary injunction. We recognize that there are close legal questions, but we find that there is a substantial likelihood that the plaintiffs will prevail. We need not and do not decide that the plaintiffs will prevail on all issues as it is sufficient to note that the plaintiffs will likely prevail at least in part. We are strongly persuaded that the equities, defined as the public interest, irreparable injury, and the

comparative harm, favor the granting of the preliminary injunction. The harm to the plaintiffs from the denial of the injunction so clearly outweighs the injury to the FmHA from the granting of the injunction that it would be inequitable to deny the injunction. Therefore, we REVERSE and REMAND to the district court to enter the preliminary injunction requiring that all FmHA foreclosures in Alabama be done through the judicial process until this lawsuit is decided on the merits.

This appeal was taken on January 5, 1983. Since that time no substantial progress has been made on the trial to the merits. An appeal from the denial of a preliminary injunction does not limit the district court's jurisdiction and should not halt the trial proceedings. *United States v. Lambert*, 695 F.2d 536, 540 (11th Cir. 1983). Indeed, had the district court considered that an additional year and four months delay in reaching the merits would result from a denial of the preliminary injunction, the decision might have been otherwise. We trust that the trial on the merits will now promptly proceed.[13]

REVERSED and REMANDED.

---

13. We urge litigants, lawyers and trial judges to proceed to final resolution in this type case. Delay accomplishes nothing. When an appeal is taken from the denial or granting of a preliminary injunction, the district court retains full authority and jurisdiction to proceed toward a judgment on the merits. Indeed, if any different treatment is indicated it would be to expedite the matter.