443 So.2d 1003 (1983)
John Newton ADAMS, III, Appellant,
v.
STATE of Florida, Appellee.
No. 82-2217.
District Court of Appeal of Florida, Second District.
November 30, 1983.
Rehearing Denied January 11, 1984.
Marshall G. Slaughter, and Jack T. Edmund, Bartow, for appellant.
Jim Smith, Atty. Gen., Tallahassee, and Robert J. Krauss, Asst. Atty. Gen., Tampa, for appellee.
GRIMES, Acting Chief Judge.
This case involves a business venture to raise and sell rabbits for pelts.
Appellant John N. Adams, III, was a promoter and rabbit breeder. In late 1978 he devised a plan in which buyers would purchase a rabbit kit in order to breed and *1004 raise Rex rabbits for pelts. The pelts were then sold to a furrier for the eventual manufacture into clothing. Adams advertised in local newspapers and held rabbit seminars at various motels.
Through a slide presentation and printed material distributed at the seminars, Adams represented to potential buyers the time and money involved in an individual rabbit operation. For an initial investment of $7,200, the buyer received the minimal plan of twelve does and two bucks. In his lecture on the breeding patterns of the animals, Adams explained that by the end of the first year, an investor could expect to have 720 new breeding does from the original twelve does.
Adams represented that a typical Rex rabbit could be raised to pelting age in four and a half months at an average cost of $1.87 per month for a return of $14-$18 per pelt. The commercial demand for fur combined with the rapid production rate of the animals should result in a profit of $400-$600 per year for each rabbit. Adams pointed out that rabbit breeding could be conducted as a secondary occupation.
Each breeder had the option of selling his pelts individually. Adams recommended, however, that a new buyer join Regency Rex Breeders' Association [Regency] of which he was a founding member. The group held meetings and published a newsletter. More importantly, a Regency member could be certain of the sale of his pelts through Regency International, Inc. [International], Adams' family rabbitry. The corporation functioned as the representative of the Regency members, collecting the rabbits and pelting them and then negotiating for the members in transactions with the furriers. Thus, when buyers purchased their kits, they frequently purchased a membership in Regency as well.
When Adams began his rabbit venture, he contacted Johannes Niemz, a foreign businessman, to establish Rex Furriers [Rex]. Rex guaranteed the purchase of all pelts raised by Regency breeders and sold through International. When a new prospect signed a purchase agreement with Adams, the investor often signed a contract with Niemz as well. Although Adams disputed any agency relationship with or monetary benefit from Rex, he did sign company checks and Rex business cards were distributed in his name.
By June 1981, Niemz proved unreliable and eventually disappeared. Rex then ceased operations. Many members of Regency who had sent their rabbits to International for pelting had not been paid. Meanwhile, Cliff Jones, an employee of Regency who assisted members with the caretaking of their rabbits, was fostering dissent among the breeders. He stopped delivering Adams' stock to new members claiming that it was of inferior quality. Charles and Mary Embry were new breeders who gave Adams a down payment but never received their animals. Jones encouraged members disaffected with Adams and his corporation, International, to split off and form a second breeders' association, United Rex Breeders [United]. The new group planned to sell their pelts independently.
By August 1981, Adams attempted to recoup his losses. Recognizing that Rex was defunct, he contacted a former business acquaintance and personal friend, Don Rowberry, who headed an investment group. As a result, Rowberry established Royal Fur Company [Royal], a Nevada corporation, which immediately began purchasing Regency pelts through International. Adams denied receiving any compensation from Royal as an employee, although he was again listed as a signatory for its company checks. Adams then contacted by letter all former breeders, including those lost to United, to reassure them of the purchase of their pelts. He encouraged disaffected members to rejoin Regency upon their signing a "contract of reaffirmation." Adams reorganized his International corporation as well. He continued his general format of lecturing in small towns throughout northern and central Florida to acquire new investors.
*1005 Adams and Niemz had originally come to the attention of the Division of Securities of the Office of the State Comptroller in 1979 for alleged violations of the state securities statute. The matter ended in Adams signing a stipulated final judgment filed in April 1981, wherein he agreed to change his sales presentation and offered to make restitution to all previous investors of his rabbit kits. The instant prosecution arose after further complaints were received, which culminated in an investigation by the Florida Department of Law Enforcement. Following a jury trial in August 1982, Adams was convicted on one count each of grand theft (count 7), sale of unregistered securities (count 8), sale of securities by an unregistered person (count 9), fraudulent security transaction (count 10), and failure to file a disclosure statement by the seller of a business opportunity (count 11). Adams now appeals each conviction.
Since Adams was charged with violating various provisions of the Florida Securities Act, our first determination must be whether the purchase agreement for his rabbit kit and Regency Association membership constituted the sale of a security. Section 517.021(15), Florida Statutes (1981), defines "security" as follows:
"Security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation, whiskey warehouse receipt or other commodity warehouse receipt, or right to subscribe to any of the foregoing; certificate of interest in a profit-sharing agreement or the right to participate therein; certificate of interest in an oil, gas, petroleum, mineral, or mining title or lease, or the right to participate therein; collateral trust certificate, reorganization certificate, preorganization subscription, or any transferable share, investment contract, or beneficial interest in title to property, profits, or earnings; interests in or under a profit-sharing or participation agreement or scheme, or any other instrument commonly known as a security, including an interim or temporary bond, debenture, note, certificate, or receipt for a security or for subscription to a security.
The state contends that Adams' contract constituted an "investment contract." The meaning of this term is not spelled out in the Florida act. However, the same term is used in the Federal Securities Act, and its classic definition was stated by the United States Supreme Court in SEC v. W.J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." Id. at 299, 66 S.Ct. at 1102, 90 L.Ed. at 1249. Thus, to prove the existence of an investment contract, the three-pronged test of Howey requires:
1. an investment of money;
2. a common enterprise; and
3. expectations of profits to be derived solely from the efforts of another.
Subsequent federal decisions have expansively construed the word "solely" of the third prong of the test to include various schemes in which the investor was required to contribute certain minimum efforts. Thus, in SEC v. Glen W. Turner Enterprises, Inc., 474 F.2d 476 (9th Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973), the court interpreted "solely" to mean "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of enterprise." Accord SEC v. Koscot Interplanetary, Inc., 497 F.2d 473 (5th Cir.1974). In defining an investment contract under the Florida Securities Act, our courts have adopted the Howey test, as modified. Florida Discount Centers, Inc. v. Antinori, 232 So.2d 17 (Fla. 1970); Rudd v. State, 386 So.2d 1216 (Fla. 5th DCA 1980), petition for review denied, 392 So.2d 1380 (1981); Le Chateau Royal Corp. v. Pantaleo, 370 So.2d 1155 (Fla. 3d DCA 1979); Bond v. Koscot Interplanetary, Inc., 246 So.2d 631 (Fla. 4th DCA 1971); Florida Discount *1006 Centers, Inc. v. Antinori, 226 So.2d 693 (Fla. 2d DCA 1969). Thus, in order to constitute an investment contract, "the efforts made by those other than the investor must be the significant ones in comparison to those made by the investor." Le Chateau Royal Corp. v. Pantaleo.
Focusing on the third prong of Howey, Adams claims that his efforts in locating a buyer for the Regency pelts were minimal when balanced against the time and energy employed by the individual investors to care for the rabbits and maintain the breeding operations. The state responds that Adams' endeavors to assure the purchase of the pelts were the significant efforts looked to by the investors to guarantee a return for their money. Without discounting the importance of ensuring a market for the rabbits, we are convinced that the efforts of the investors in raising the rabbits were at least as essential to the success of the venture.
During his presentations and in printed materials, Adams detailed for the investors the time and attention necessary to raise quality stock for the most marketable rabbit pelts. He stressed the caretaking aspect of the operation and explained the optimum breeding conditions. The Regency Breeders Association had employed Cliff Jones as a "troubleshooter" to assist them with health and production problems. Breeders could visit Adams' own rabbitry for advice, and he made occasional visits to members' homes. Adams emphasized to an investor that only after he raised and maintained a sizeable number of animals to pelting age would he realize the advertised returns.
We distinguish the investment contract cases cited by the state. SEC v. Turner and SEC v. Koscot were based on pyramid selling schemes in which the investors' primary responsibility was simply to recruit other investors. Miller v. Central Chinchilla Group, Inc., 494 F.2d 414 (8th Cir.1974), and Smith v. Gross, 604 F.2d 639 (9th Cir.1979), are factually closer because Miller involved the sale of chinchillas and the investors in Smith bought earthworms. However in both schemes the advertised profits could be realized only if the promoters secured new investors to buy the stock at inflated prices. Hence, unlike the instant case, the undeniably significant efforts for the promised return were those of the promoters and not of the investors.
We next consider the sufficiency of the evidence to sustain Adams' conviction for grand theft. Mrs. Embry testified that she and her husband entered into a purchase agreement with Adams, made a $3,600 down payment, and never received their rabbits. Although the record reflects contradictory evidence with respect to the scheduled readiness of their cages, Mrs. Embry asserted that the primary reason for nondelivery of the stock was the Embrys' decision to end the arrangement altogether. Their cancellation came after Cliff Jones warned them of the alleged poor quality of the animals. When Mrs. Embry contacted Adams, he assured her of a refund after he sold additional rabbit kits. He continued to guarantee the return of their money, although his only obligation under the agreement was to deliver the rabbits as ordered. He specifically denied any intent to defraud the Embrys or any other breeders through nondelivery of their animals.
Adams testified that at the time he entered into the kit sale with the Embrys, his sole intent was to abide by the provisions of the agreement. The Embrys never contended that Adams refused to comply with the contract. Rather, Mrs. Embry stated they had simply changed their minds. Moreover, Adams openly admitted accepting the Embrys' down payment and stated under oath that his debt to them remained outstanding.
Under the old larceny statute, the felonious intent required to convict had to exist at the time of the taking. Helton v. State, 135 Fla. 458, 185 So. 864 (1938); Reid v. Florida Real Estate Commission, 188 So.2d 846 (Fla. 2d DCA 1966). There is nothing in the new theft statute to suggest that this rule has been changed. In Martin v. State, 379 So.2d 179 (Fla. 1st DCA *1007 1980), the court held that a contractor who had accepted a down payment on a construction job but thereafter made no effort to perform had not committed grand theft. On the other hand, the court in Brewer v. State, 413 So.2d 1217 (Fla. 5th DCA 1982), petition for review denied, 426 So.2d 25 (1983), upheld the conviction of grand theft of one who accepted money for the performance of services and immediately disappeared until his arrest more than two years later. Our supreme court has said that where a "taking was in the open, with no subsequent attempt to conceal it, and there was no concealment nor denial of such taking, but on the other hand, an express avowal thereof," a strong presumption of no felonious intent is raised. Maddox v. State, 38 So.2d 58 (Fla. 1948). Measured by applicable law, there was insufficient evidence that Adams possessed the requisite felonious intent to steal the Embrys' down payment at the time he sold them the rabbit kit. We note that Adams was not charged with the commission of any fraudulent practices under Chapter 817, and he was acquitted of misrepresentation by the seller of a business opportunity.
The nature of Adams' venture clearly constituted the sale of a "business opportunity" as defined in section 559.801(1), Florida Statutes (1981). Therefore, the evidence supports the jury's conclusion that Adams violated the law by failing to file the disclosure statement required by section 559.805, Florida Statutes (1981).
We hereby reverse Adams' conviction under counts 7 through 10 and order that he be discharged of those counts. We affirm the judgment and sentence on count 11.
SCHOONOVER and LEHAN, JJ., concur.