## OFFICE OF THE COMPTROLLER v FLORIDA SEAFOOD BROKERS, INC., et al.

Case No. 86-3945

State of Florida, Division of Administrative Hearings

March 31, 1987

### APPEARANCES OF COUNSEL

**Robert K. Good** for petitioner.

**Richard H. Powell** for respondent, Jerry Russell Ogle.

### OPINION OF THE COURT

ROBERT T. BENTON, II, Hearing Officer.

### *RECOMMENDED ORDER*

This matter came on for hearing in Crestview, Florida, before Robert

T. Benton, II, Hearing Officer of the Division of Administrative Hearings, on January 26, 1987. The parties filed proposed recommended orders on March 16, 1987. The attached appendix addresses proposed findings of fact by number. Petitioners and the only party respondent who requested an administrative hearing appeared through counsel.

On August 25, 1986, Gerald Lewis, as Comptroller of the State, entered a cease and desist order and notice of rights alleging that Florida Seafood Center, Inc., Florida Seafood Brokers, Inc., William Carl Webster, Barry Louis Harris and Jerry Russell Ogle had sold twenty-five "open top display" freezers to Paul Richards with an agreement to lease them back, to sell fish from them, and to use part of the fish sales proceeds to make payments under the leases, all of which was alleged to amount to sale of an unregistered security.

Specifically, count one of the cease and desist order and notice of rights alleges that "[i]n or about May, 1984, Paul Richards was advised of an investment opportunity in FLORIDA SEAFOOD CENTERS, INC., by Respondent JERRY OGLE"; that "[d]uring a meeting arranged by Respondent OGLE between Paul Richards and Respondent WEBSTER, WEBSTER offered to pay Richards, in addition to the monthly lease payment, one (1%) of the gross sales of FLORIDA SEAFOOD CENTERS, INC., if Richards would buy twenty-five (25) freezers, or two (2%) percent if he bought fifty (50) freezers"; that "WEBSTER represented further that he had established business in Del Champs, A & P Food Stores, and Pantry Pride"; that "Richards agreed to invest in twenty-five (25) freezers on the strength of Respondent WEBSTER'S representations . . . [making] an investment of $37,500.00, which he . . . paid to WEBSTER, through OGLE." At hearing, petitioner abandoned counts two through five.

## ISSUES

Whether the equipment purchase and lease agreement to which Paul Richards and Florida Seafood Centers, Inc., became parties is an "investment contract" and so a security, within the meaning of Section 517.021, Florida Statutes (1985)? If so, whether it was exempt from registration requirements under Section 527.061(11)(a), Florida Statutes (1985)? If not, whether respondent Ogle solicited an offer, or offered or attempted to dispose of any interest in the agreement for value?

## FINDINGS OF FACT

1. William Carl Webster had an idea, but no money. In fact, the business he and his wife owned, Cap'n Carl's Seafood Company, was in

210

■■■■■■■■■■■■■■■■■■■■■■■

bankruptcy. No stranger to the seafood business, wholesale or retail, he had been involved for some twelve years. He came to believe he could profit by adopting a technique he noticed purveyors of pizza and milk used: the "impulse freezer," a topless display freezer rolled into the middle of a grocery store aisle to attract customers' attention.

2. The "concept" was to sell frozen seafood wholesale to licensed food retailers. Webster believed it would be a simple matter of establishing the accounts, installing the freezers, and arranging with a reputable Tampa Bay fish house to deliver "custom packed" seafood.

3. Overhead would be minimal, or so Mr. Webster told Barry Louis Harris, with whom he had played baseball in high school, and from whom he borrowed three thousand dollars for the new venture.

4. None of this money was left by the time Mr. Webster dropped in on Jerry Russell Ogle, an account executive in the Fort Walton Beach office of A. G. Edwards & Sons, Inc., to discuss the ins and outs of going public, in late April of 1984. Mr. Ogle recommended against going public but expressed a willingness to help for a fee.

5. Both Florida Seafood Centers, Inc., and Florida Seafood Brokers, Inc., came into existence on April 24, 1984. Articles of incorporation drawn by Messrs. Webster and Harris, with the help of a kit, were filed that day.

6. Jerry Ogle is registered with petitioner as a securities dealer. One of Mr. Ogle's customers, Paul Richards, had been a builder and developer before he moved to Florida from Ohio. As he sold properties in Ohio, he deposited the proceeds in his account at the Fort Walton Beach office of A. G. Edwards & Son. Since Mr. Richards had expressed an interest in investing in a small business, Mr. Ogle thought some of this money might be available for the enterprise on which Messrs. Webster and Harris had embarked.

7. Before taking Mr. Richards to lunch at the Harborlight, Mr. Ogle sought and obtained the oral approval of the A. G. Edwards' branch manager to work as a "marketing consultant" for Florida Seafood Centers, Inc. At lunch, he mentioned Florida Seafood Centers, Inc., and gave a "capsule form" account of the business to Mr. Richards.

8. Mr. Richards expressed interest, and Mr. Ogle arranged a second luncheon meeting a week or two later. Messrs. Richards, Webster, Harris and Ogle gathered in Mr. Ogle's office, before setting out for lunch at the High Tide. Mr. Ogle told Mr. Richards he thought that Mr. Webster's idea was a good one, but it was Mr. Webster who presented the idea in detail.

9. Although remarking that he might be "digging a hole and throwing money into it," Mr. Richards decided to purchase 25 freezers from Florida Seafood Centers, Inc. On May 23, 1984, he signed an equipment purchase and lease agreement, but negotiations continued and the final agreement was executed on May 24, 1984, in Mr. Ogle's office. At this meeting, Mr. Richards drew a check for $10,000.00 on his A. G. Edwards & Sons, Inc. Total Assets Account, Mr. Ogle witnessed the equipment lease agreement Messrs. Richards and Webster signed, and Mr. Ogle wrote, at the bottom of the agreement, "Rec'd $10,000 5-24-84 JRO." Respondent's Exhibit No. 1.

10. Under the equipment purchase and lease agreement, Mr. Richards purchased freezers to lease to Florida Seafood Centers, Inc. In exchange, he was to receive "one half of the net profit of [each] freezer . . . not [to] exceed $800.00 per month for each freezer." Respondent's Exhibit No. 1. As per Ogle's suggestion, he was also to get "1% of gross sales revenue of Florida Seafood Centers," *Id.,* all payments to begin after a 180-day "grace period." Mr. Richards' only obligation under the parties' agreement was to pay $1,500.00 for each freezer, or $37,500.00 in all. He had the option to choose among available locations, but had no responsibilities for installation or operation of the freezers or for the sale of seafood. His role was that of a passive investor.

11. Mr. Richards was the only person in Florida who invested in this way, although two of the Alabamians who invested also had houses in Florida. Mr. Richards understood he was the initial investor, but knew others would be approached. The equipment purchase and lease agreement was never registered as a security.

12. Mr. Harris took Mr. Richards' $10,000.00 check to a Barnett Bank branch and opened a bank account for Florida Seafood Centers, Inc., by depositing the check less $2,000.00 cash the bank disbursed and Mr. Webster took to cover expenses already incurred. The first check drawn on Florida Seafood Centers, Inc.'s first bank account was for $500.00 in favor of Mr. Ogle, dated May 28, 1984.

13. Mr. Ogle had told Mr. Webster he expected to be paid for his time and Mr. Webster had agreed, before Mr. Richards signed the equipment lease agreement, to pay Mr. Ogle something if he was ever in a position to do so. At the hearing, they testified the payments to Mr. Ogle—$2,000 in cash from the proceeds of Mr. Richards' second and final check to Florida Seafood Brokers, Inc., dated June 4, 1984, in addition to the $500 check—were for his services as a "marketing consultant."

212

14. Mr. Ogle never told Mr. Richards he had any sort of agreement with Florida Seafood Brokers, Inc. or Mr. Webster, and Mr. Richards was aware of none before investing in the enterprise. Mr. Ogle did know that bankruptcy had befallen Cap'n Carl's Seafood Company.

15. Mr. Richards never received any payment or sales reports. Some freezers were placed in Piggly Wiggly stores in Birmingham, among other places, without, however, Mr. Richards' advice or assistance, as far as the record shows. Such sales of fish as Messrs. Webster and Harris made were in amounts too small to make deliveries of custom-packed seafood economic, so they were obliged to repack the seafood themselves, which entailed renting space and bring it up to health department standards, all at considerable, unanticipated expense. Eventually the business failed.

## CONCLUSIONS OF LAW

The Office of the Comptroller having referred this matter for hearing, in accordance with Section 120.57(1)(b)3, Florida Statutes (1986 Supp.)., the Division of Administrative hearings has jurisdiction for purposes of entry of a recommended order.

The initial legal dispute between the parties is whether the equipment purchase and lease agreement, under which Mr. Richards undertook the purchase of 25 freezers, then leased them to Florida Seafood Centers, Inc., in exchange for one percent of Florida Seafood Centers, Inc.'s gross revenues plus half the net profit (had any materialized) from each freezer (not to exceed $800 per month) amounts to an investment contract, within the meaning of Section 527.07, Florida Statutes (1986 Supp.), and therefore a security within the meaning of Section 527.07, Florida Statutes (1985).

Then Judge Grimes, writing for the court in *Adams v. State,* 443 So.2d 1003 (Fla. 2d DCA 1983) (reh. den. 1984) summarized the definition of investment contract laid down in *SEC v. W. J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed.2d 1244 (1946) as requiring these elements:

1. an investment of money;

2. a common enterprise; and

3. expectations of profits to be derivedsolely from the efforts of another.

443 So.2d at 1005.

Here money was invested with the expectation of profits from the efforts of Messrs. Webster and Harris. Although Mr. Richards had the

**213**

option of specifying where to try to place the freezers, the evidence indicated he did not do so, and he was not, in any event, required to, under the equipment purchase and lease agreement.

Respondent argues that the equipment purchase and lease agreement was not an investment contract, however, on grounds that there was no "common enterprise," since Mr. Richards was the sole investor in Florida. But the investors' residence is not material on the question of whether there was a common enterprise. There were in fact other investors, and the contemplation of other investors was part of the appeal of the "1% of gross sales revenue" that helped induce Mr. Richards' investment. The present case falls outside the rationale of *Brown v. Rairigh,* 363 So.2d 590 (Fla. 4th DCA 1978), in which the owner of race horses sold a fractional interest to a single investor.

As a security, the equipment purchase and lease agreement should have been registered before being offered for sale, unless, as respondent contends, it was exempt, under Section 527.061(11)(a), Florida Statutes (1986 Supp.). This exemption is available only when all of the following conditions obtain:

1. There are no more than 35 purchasers, or the issuer reasonably believes that there are no more than 35 purchasers, of the securities of the issuer in this state during an offering made in reliance upon this subsection or, if such offering continues for a period in excess of 12 months, in any consecutive 12-month period.

2. Neither the issuer nor any person acting on behalf of the issuer offers or sells securities pursuant to this subsection by means of any form of general solicitation or general advertising in this state.

3. Prior to the sale, each purchaser or his representative, if any, is provided with, or given reasonable access to, full and fair disclosure of all material information.

4. No person defined as a "dealer" in this chapter is paid a commission or compensation for the sale of the issuer's securities unless such person is registered as a dealer under this chapter.

5. When sales are made to five or more persons in this state, any sale in this state made pursuant to this subsection is voidable by the purchaser in such sale either within 3 days after the first tender of consideration is made by such purchaser to the issuer, an agent of the issuer, or an escrow agent or within 3 days after the availability of that privilege is communicated to such purchaser, whichever occurs later.

The only one of these conditions petitioner contends has not been met is the third, requiring full and fair disclosure of all material information. Even if Mr. Ogle's compensation could be characterized, in whole or in part, as a commission, the parties stipulated that he was registered as a dealer under Chapter 517.

Mr. Richards was apprised of the bankruptcy of Cap'n Carl's Seafood Company, that the new venture lacked significant other funding, and that he would be the first to purchase freezers to lease to the new company; and he had been told of other circumstances that might have discouraged a more timid investor. He did not know, however, just where the company's finances stood. He did not know and was not told, for example, that the company had no bank account. Nor was he informed that the stockbroker who steered him to this investment was working for Florida Seafood Centers, Inc., and would end up with $2,500.00 of what he invested. The lack of a bank account and Mr. Ogle's relationship to Florida Seafood Centers, Inc. were material facts which were not disclosed; and the exemption contemplated by Section 527.061(11)(a), Florida Statutes (1986 Supp.), was unavailable for that reason.

The offer to Mr. Richards violated Section 517.07, Florida Statutes (1986 Supp.) But Respondent contends that he did not himself offer to sell anything to Mr. Richards. The statute defines an offer to sell as:

> any attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security or an investment or an interest in an investment, for value. Section 517.021(13), Florida Statutes (1986 Supp.)

The evidence as a whole showed Mr. Ogle's role was an important one in bringing the investment contract to fruition. He told Mr. Richards about the venture, brought the parties together, participated in all meetings between them before the contract was signed, suggested at least one of the terms of the contract, took Mr. Richards' checks and gave him receipts. He attempted to dispose of a security, within the meaning of the statute.

It is accordingly,

RECOMMENDED:

That petitioner make its cease and desist order final against Jerry Russell Ogle.

DONE and ENTERED this 31st day of March, 1987, at Tallahassee, Florida.