Vernon E. HARGRAY, Plaintiff,

v.

CITY OF HALLANDALE, Defendant.

No. 91–6661–CIV.

United States District Court,
S.D. Florida.

Aug. 30, 1993.

Robert E. Weisberg, Martha A. Chapman, Law Offices of Robert E. Weisberg, Coral Gables, FL, for plaintiff, Vernon E. Hargray.

Richard Kane, City Atty. for Hallandale, Hallandale, FL, for defendant, City of Hallandale.

## MEMORANDUM OPINION AND FINAL JUDGMENT

GRAHAM, District Judge.

Plaintiff, Vernon E. Hargray ("Hargray"), filed suit against Defendant, City of Hallandale ("City"), pursuant to 42 U.S.C. § 1983, seeking damages for the alleged deprivation of his property interest in continued employment with the City in violation of the Fourteenth Amendment to the United States Constitution. This case was tried before the Court sitting without a jury on June 24, 1993. Having heard and considered the testimony of the witnesses and the arguments of counsel, and reviewed the exhibits presented, the Court makes the following findings of fact and conclusions of law.

### I. FINDINGS OF FACT

Hargray is a forty-two year old male who has been married for seventeen and a half years. He and his wife have a four year old son. On November 2, 1979 Hargray commenced employment with the City. From 1979 to July 1983 Hargray was the Program Coordinator with the City's Social Services Department. In July 1983, Hargray was transferred to the City's Public Works and Utilities Department ("DPW") as an Administrative Supervisor and assistant to the Director of DPW, John Depp ("Depp"). In May 1989, Hargray was promoted to the position of Operations Manager in the DPW, a position he held until his resignation on August 24, 1990. The City considered Hargray a "star employee" to the extent that on February 5, 1990, Depp nominated Hargray for the City's Employee Excellence Award. (Pl.'s Ex. 1).

Sometime in 1989, Hargray saw an acquaintance, Richard McDonald ("McDonald"), at a church function and later recommended him for the position of superintendent over grounds and maintenance which had been vacant for months. Hargray had previously recommended that the City hire someone with a landscape background and the City had refused. The City Manager, R.J. Intindola ("Intindola"), made the final decision to hire McDonald.

At all material times, Intindola was (and is) the City Manager and, as such, is responsible for establishing, implementing and maintaining the policies and practices of the City. Intindola has final policy-making authority for the City with respect to personnel and administration.

In June 1990, three or four employees of the DPW went to Richard Wroblewski ("Wroblewski"), the City's Personnel Director, with allegations that Hargray and McDonald were involved in taking City property. Wroblewski sent the employees to speak with Depp. In June 1990, Hargray became aware of rumors regarding stealing in the DPW and heard that there had been a meeting between Depp and McDonald.

On Saturday, August 4, 1990, Hargray and a number of his employees worked on City projects. Hargray went to Sheridan Lumber and picked up thirteen (13) 4 × 4 pieces of lumber listed on a purchase order. Hargray took said lumber to the DPW's compound. On Monday, August 7, 1990 or Tuesday, August 8, 1990 Hargray's wife informed him that a party for her office[1] was going to be held at their home on the coming Saturday, August 11, 1990.[2] On the day that he was told of the party or the following day, Hargray took home seven (7) pieces of the 4 × 4 lumber in order to mark off a parking area in his yard for the party. In addition, Hargray checked out a garbage can[3] from the City and told Grover Jones, a sanitation foreman with the City, that he was going to use the garbage can for a party at his home. Grover Jones allowed Hargray to borrow the garbage can.[4] Hargray intended to return the

---

1. Vanessa Hargray has worked with the Florida Department of Health & Rehabilitative Services (HRS) for twelve years.

2. Hargray and his wife have lived in their present home since 1979.

3. Hargray checked out a yellow garbage can referred to by the City as a "tote barrel."

4. At trial, Grover Jones testified that he now feels he should have gotten permission from his superintendent to allow Hargray to borrow said trash can.

lumber and garbage can after the party. It was customary for City employees to borrow items such as tables and chairs, etc. for personal use.

On August 8, 1990, City officials, including Depp, received an anonymous letter accusing Hargray and McDonald of gross misuse of the City's equipment and supplies (Def.'s Ex. 1). Intindola, the City Manager, directed the City police department to conduct an investigation of the allegations contained in the August 8th letter. Lieutenant William Owens ("Lt. Owens") and Investigator Tommy Long ("Inv. Long") were primarily responsible for the investigation.

During the course of their investigation, Lt. Owens and Inv. Long photographed Hargray's house [5] and interviewed twenty-eight (28) City employees. On August 20, 1990, McDonald resigned and admitted to violating City policy by using City equipment or property for his personal use. (Pl.'s Ex. 8). On August 23, 1990, the police department offered McDonald the option of resolving the criminal investigation against him through administrative rather than criminal channels. A written agreement was presented to McDonald who was allowed to consider the offer overnight and discuss it with an attorney. On the following day, August 24, 1990, McDonald signed the agreement. (Pl.'s Ex. 19). McDonald spoke with the officers about the items he took from the City and repeatedly denied that Hargray had any involvement in or knowledge of McDonald's theft of City property. (See, Pl.s Ex. 20).

Lt. Owens had three meetings with Intindola, the City Manager, prior to August 24, 1990. At the third meeting, Lt. Owens told the City Manager that he had probable cause to bring criminal charges of grand theft against Hargray. The misappropriations that Lt. Owens relied on were the 4 × 4 timber from Sheridan Lumber and the yellow garbage can. Lt. Owens and the City Manager then discussed the situation. It was Lt. Owens' goal to obtain Hargray's resignation if he confessed to wrongdoing. Lt. Owens was not aware that Hargray received permission from Grover Jones to borrow the garbage can for a party but thought that Hargray went solely to pick up the lumber he wanted for his home. At the trial, Lt. Owens could not recall whether he understood from Hargray's interview that the lumber was to be used permanently or temporarily.

At approximately 1:45 p.m. on August 24, 1990, Depp informed Hargray that the police wanted to talk to him. Hargray arrived at the police station at approximately 2:00 p.m. Lt. Owens and Inv. Long commenced Hargray's interrogation at approximately 3:30 p.m. in an interrogation room [6]. The interview was taped but the recording did not commence until five to ten minutes after the beginning of the interrogation. During those pre-taping minutes, Lt. Owens informed Hargray that he was the subject of a grand theft investigation. Lt. Owens handed Hargray a memo from the Chief of Police offering Hargray the option of resolving the allegations of impropriety in the DPW through administrative rather than criminal channels.[7] Hargray had only a few minutes to consider the offer. The police officers did not offer him additional time to discuss the matter with an attorney.

Lt. Owens left the room for a short period prior to the taping of the interrogation and upon his return, Hargray chose to handle the matter administratively.[8] The tape recorder was turned on approximately five minutes after Hargray signed the memo. (Pl.'s Ex. 10).

Hargray felt intimidated during the interrogation. He had never been previously arrested or interrogated. During the interview, Hargray repeatedly denied taking any City property, except that he admitted to having borrowed some 4 × 4 lumber and the yellow garbage can. (Pl.'s Ex. 9B at 31, 33,

5. Four (4) photographs depicting the front and side of Hargray's house were introduced as Defendant's Composite Exhibit 3.

6. The room was approximately 8' × 8'.

7. Said memo was dated August 24, 1990. (Pl.'s Ex. 10).

8. Lt. Owens testified that prior to the tape recording, Hargray did not say anything that indicated guilt.

40, 42). Lt. Owens informed Hargray that even borrowing City property with notice and permission is a crime. Lt. Owens stated as follows:

LT. OWENS: The bottom line of this interview is, the only property of the City of Hallandale that you misappropriated to your own personal use, or to use another word, to steal for your own personal use, either temporary—see, you have to understand what theft says.

The theft statute says temporarily or permanently. Okay? So to take temporarily or permanently to your own personal use is a commission of theft. That's the reading of the statute, that's the legal end of it. There's borrowing and then there's borrowing permanently.

So the only thing is one of the yellow trash cans on a temporary basis and the lumber?

Mr. HARGRAY: That is it, that is it. That's why I felt, you know, and I even forgot about the, like I said, you know, about the timber. (Pl.'s Ex. 9B at 65).

There was insufficient evidence that Hargray intended to resign when he went to the police station on August 24, 1990. Neither Lt. Owens nor Inv. Long stated that, prior to the taping, Hargray told them he intended to resign. On the other hand, twice during the interrogation Lt. Owens told Hargray that the City Manager wanted his resignation. Those exchanges were as follows:

LT. OWENS: I've got a couple of things. I'll put this on. Upon conclusion of this meeting, before you go home tonight, the City Manager wants your resignation—if you would like to—I believe you'll be seeing Mr. McDonald—

MR. HARGRAY: No—oh, yeah—

LT. OWENS: —resignation?

INV. LONG: Yeah, I do. John gave it to me, something—two years, that is at least a guide to your—probably be appropriate. I'm assuming by the time we're done here the secretarial staff will be gone.

MR. HARGRAY: Well, somebody should be there.

LT. OWENS: If they're not, we can have the secretarial staff here do that for you. You can either write it out yourself, or

we'll give you a copy of that and you can, you know, take the appropriate verbiage from it that you feel is relevant to yours— (Pl.'s Ex. 9B at 49).

\*   \*   \*   \*   \*   \*

INV. LONG: Good. I don't have any more questions. Do you?

LT. OWENS: I have no more either, but the City Manager is adamant about the resignation before you leave today. If you want to make a call, you can use the phone out here, then call us. (Pl.'s Ex. 9B at 79).

The interrogation concluded without a confession being made by Hargray who maintained that he had merely borrowed the yellow garbage can and some 4 × 4 lumber with notice and permission from Grover Jones. The interrogation ended at 5:00 p.m. at which time, Hargray returned directly to his office and signed a letter of resignation. (Pl.'s Ex. 11). Hargray purportedly resigned immediately after the police interrogation because Lt. Owens led him to believe that if he did not do so he could and would be prosecuted for grand theft for borrowing the garbage can and lumber.

After submitting his letter of resignation Hargray attempted to drive home. He was too distraught to drive all the way home so he went to the home of Mary Washington, his former supervisor and the director of the City's Social Services department. He told Mary Washington that he had to resign and that the police had accused him of theft. Mary Washington testified that Hargray was visibly shaken and upset and unable to drive home. Later that evening, Hargray told his wife and mother that he resigned in fear that he would be arrested for grand theft for having borrowed the garbage can and lumber.

On August 29, 1990, Inv. Long set a memo to Lt. Owens listing the items Hargray was alleged to have stolen and those Hargray allegedly "confessed" to stealing. (Pl.'s Ex. 28). Other than the garbage can and the lumber that Hargray admitted to having borrowed, the items listed were apparently taken from the comments allegedly made by the employees interviewed by the police. Hargray never admitted to taking the remaining

items. The list was sent to the DPW to have a dollar figure assessed to each item. The City later deducted $550.00 from Hargray's final pay check which was the total amount of the items Hargray allegedly "confessed" to having stolen. Hargray objected to this deduction from his pay.

Vanessa Hargray testified that her husband was very distraught for months after his resignation and to the date of the trial continued to be deeply affected by the City's actions towards him. Hargray went to see Dr. Caren Singer in September 1990 for stress-related problems arising from the loss of his job. Dr. Singer referred Hargray to a psychiatrist because she felt his symptoms were so severe that he required more intensive treatment. Dr. Yves Eveillard, a psychiatrist, treated Hargray. Hargray suffered great mental anguish, loss of self-esteem and depression which was manifested by sleep disturbances, obsessive behavior, crying, anger, weight loss and anxiety. Hargray also lost income and benefits.

In December 1990 Hargray obtained a lower paying job with the City of Pompano Beach and in 1991 he obtained employment with the City of Tamarac where he is presently employed.

As of August 1990, the City had no policy against the borrowing of City property for the employee's personal use. City employees other than Hargray had borrowed City property for their personal use. There was no evidence that any City employees, other than Hargray, were discharged or forced to resign because they had borrowed City property.[9]

Hargray sought advice on getting his job back from Wroblewski, the City's personnel director. Hargray requested a letter explaining why he had to resign but did not receive such a letter. Wroblewski did not advise Hargray to file a written appeal with the Civil Service Board. In early September 1990, Hargray unsuccessfully attempted to rescind his purported resignation.

## II. CONCLUSIONS OF LAW

The City's actions of which Hargray complains are state actions under the Fourteenth Amendment and thus actionable "under color of law" pursuant to 42 U.S.C. § 1983. Municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986). Intindola, the City Manager, had policy making authority with respect to personnel matters and directed the police officers to obtain Hargray's resignation, therefore, the Court finds that the City Manager's actions are attributable to the City.

### A. Deprivation of Property Interest

■ Hargray alleges that he had a property interest in his continued employment with the City because he was covered by the City's Civil Service rules which protected him from arbitrary dismissal. If Hargray had a property right, the City could not deprive him of his property without due process. *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985); *Board of Regents v. Roth*, 408 U.S. 564, 576–578, 92 S.Ct. 2701, 2708–2709, 33 L.Ed.2d 548 (1972). Property interests are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law. *Loudermill*, 470 U.S. at 539, 105 S.Ct. at 1491; *Bd. of Regents v. Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. Under Florida law, a property right in employment is created when a statute or ordinance lists specific grounds for discharge of a public employee or states that a public employee can only be terminated for just cause. *Hearn v. City of Gainesville*, 688 F.2d 1328, 1332 (11th Cir.1982).

■ It is undisputed that Hargray had achieved permanent employee civil service status with the City before being promoted to the position of Operations Manager in May 1989. The position of Operations Manager became specifically exempted from civil

---

9. One City employee was disciplined in connection with the borrowing of a chain saw. This employee was disciplined, however, because he failed to reveal that the equipment was broken, not because it was borrowed.

service coverage by Ordinance No. 89–19, effective July 17, 1989. However, said Ordinance provided:

> *SECTION 2.* Those persons presently occupying the positions of Assistant Personnel Director, Assistant Director of Human Resources, and Operations Manager, which have been added by this ordinance to those positions which are exempt from civil service coverage, shall continue to be covered by the civil service system now existing or as it may be amended from time to time as long as they occupy those positions or other positions which are covered by civil service at the time they assume such position or positions. (Pl.'s Ex. 6, Tab 1).

The City's Code of Ordinances, Section 21–1 provides in pertinent part that:

> (a) **Policy.** It is hereby declared to be the policy of the city that city employees not specifically excepted hereinbelow or by ordinance shall be constituted as civil service employees and shall be employed, retained, governed, directed and discharged as hereinafter provided. It is further the policy of the city that certain positions in the city's employ shall be excluded from civil service coverage because of the managerial, professional or confidential nature of their responsibilities. **Persons occupying these excluded positions and who have no previous civil service status with the city** shall continue in their employment at the discretion of the city manager of the city commission (as the city Charter provides), who shall have the authority to terminate the employment of such persons.
>
> (b) **Removal, termination. Any employee of the city who holds permanent civil service status** and is appointed or assigned to any other position not under civil service may be removed from such position by the city manager and may be terminated for sufficient cause, **pursuant to the**

**procedures under the civil service rules and regulations.** (emphasis added) (Pl.'s Ex. 6, Tab 2).

The City's Civil Service Rule XVI at Section 2 enumerates grounds for dismissal, suspension and demotion of a permanent employee with civil service rights. (Pl.'s Ex. 5, tab 3). In addition, the City's Code of Ordinances, Section 21–10 requires notice of discharge.[10] Based on the above referenced City Ordinances and Civil Service Rules, the Court finds that Hargray possessed a constitutionally protected property interest in continued employment with the City.

### B. The Resignation

■ Hargray alleges that his resignation was coerced by the events which occurred on August 24, 1990. The City contends that the resignation was a voluntary choice between two unpleasant alternatives i.e., resign or face criminal charges. Inherent in the City's proposition is that the City had reasonable grounds to file criminal charges. The City makes this assertion even though Hargray admitted to having borrowed the garbage can and lumber and emphatically denied taking the other items listed on the August 29, 1990 memo from Inv. Long to Lt. Owens. (Pl.'s Ex. 28). If an employee can show that the agency knew that the reason for the threatened removal could not be substantiated, the threatened action by the agency is purely coercive. *Schultz v. United States Navy,* 810 F.2d 1133, 1136 (Fed.Cir.1987).

If Hargray "resigned of his own free will even though prompted to do so by events set in motion by his employer, he relinquished his property interest voluntarily and thus cannot establish that the [City] 'deprived' him of it within the meaning of the due process clause." *Stone v. Univ. of Maryland Medical System Corp.,* 855 F.2d 167, 173 (4th

---

10. City Ordinance, Section 21–10 provides as follows:

> **Sec. 21–10. Discharge of permanent employees-Notice of discharge.**
> The discharge of a permanent employee other than at the end of a probationary period shall not become effective until the department head shall have first served upon such employee of the department a written notice of discharge which shall contain one or more reasons or grounds for discharge, together with such specifications of facts as will enable said employee to make an explanation and place him fairly upon his defense, giving such employee an opportunity to make an explanation, and file it with the civil service board together with a copy of such notice of discharge and explanation, if any, made by the employee. (Pl.'s Ex. 6, tab 2).

Cir.1988). If, on the other hand, Hargray's "resignation" was so involuntary that it amounted to a constructive discharge, it must be considered a deprivation triggering the protections of the due process clause. *Id. See, Parker v. Bd. of Regents of Tulsa Jr. College*, 981 F.2d 1159, 1162 (10th Cir.1992) (if plaintiff's resignation was so involuntary it amounted to a constructive discharge, defendants deprived her of her property interest without due process).

A voluntary resignation requires that a choice between two alternatives, however unpleasant, must be understood by the employee and the decision be freely made. *Covington v. Dept. of Health & Human Services*, 750 F.2d 937, 943 (Fed.Cir.1984). To determine whether the resignation was voluntary, the Court must look at the totality of the circumstances to determine whether the employee had the opportunity to exercise a free choice. *Parker*, 981 F.2d at 1162; *Scharf v. Dept. of the Air Force*, 710 F.2d 1572, 1574 (Fed.Cir.1983). Factors to be considered are (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether he was permitted to select the effective date of resignation. *Stone*, 855 F.2d at 174. Resignations have been found involuntary and deemed to be deprivations of property where obtained by the employer's misrepresentation or deception[11] or forced by the employer's duress or coercion.[12]

The misrepresentation need not be intentional. In *Covington*, 750 F.2d at 942, the Court stated:

> [T]here is no requirement that an employee be intentionally deceived about his employment options, it being sufficient that

the "employee shows that a reasonable person would have been misled by the agency's statements." The misleading information can be negligently or even innocently provided; if the employee materially relies on the misinformation to his detriment, his retirement is considered involuntary. (citing *Scharf*, 710 F.2d at 1575).

During the interrogation in the instant case, the police officers misled Hargray regarding the law by defining borrowing as synonymous with theft.

The City attempted to show at trial that it had probable cause to prosecute Hargray for grand theft. The existence of probable cause is based on objective standards and the totality of the circumstances. *United States v. Hastamorir*, 881 F.2d 1551, 1557 (11th Cir. 1989). Probable cause to arrest is present where the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense. *United States v. Mastrangelo*, 733 F.2d 793, 799 (11th Cir.1984) (citation omitted).

The Florida criminal theft statute, Fla. Stat.Ann. § 812.014 (West 1993)[13], requires proof of intent to deprive another person of a right to or benefit from the property involved. *Melrose Nursery, Inc. v. Hunt*, 443 So.2d 441 (Fla. 3rd DCA 1984). Where a taking was in the open, with no subsequent attempt to conceal it, and there was no concealment nor denial of such taking, but on the other hand, an express avowal thereof, a strong presumption of no felonious intent is raised. *Adams v. State*, 443 So.2d 1003, 1007 (Fla. 2d DCA 1983) (quoting *Maddox v. State*, 38 So.2d 58, 59 (Fla.1948)). The Court finds that the City failed to establish by

---

11. *See, Scharf*, 710 F.2d at 1574–76 (petitioner's optional retirement was involuntary where he, in good faith, justifiably relied on employer's misleading statement).

12. *See, Schultz v. United States Navy*, 810 F.2d 1133, 1136 (a resignation is not voluntary where an agency imposes the terms of an employee's resignation, the employee's circumstances permit no alternative but to accept, and those circumstances were the result of improper acts of the agency).

13. Fla.Stat.Ann. § 812.014 provides in pertinent part:

(1) A person commits theft if he knowingly obtains or uses, or endeavors to obtain or use, the property of another with intent to, either temporarily or permanently:

(a) Deprive the other person of a right to the property or a benefit therefrom.

(b) Appropriate the property to his own use or to the use of any person not entitled thereto.

competent evidence the existence of probable cause to prosecute Hargray for grand theft.

Hargray relied upon the officers' misrepresentations regarding the grand theft charges in making his decision to resign. Therefore, Hargray's purported resignation was involuntary since "[a] decision made 'with blinders on,' based on misinformation or a lack of information, cannot be binding as a matter of fundamental fairness and due process." *Covington,* 750 F.2d at 943.

The three-part test for duress is (1) that one side involuntarily accepted the other's terms, (2) that circumstances permitted no other alternative, and (3) that said circumstances were the result of coercive acts of the opposite party. *Christie v. United States,* 518 F.2d 584, 587, 207 Ct.Cl. 333 (1975) (citation omitted); *Taylor v. United States,* 591 F.2d 688, 691, 219 Ct.Cl. 86 (1979). In the case at bar, time pressure was placed on Hargray who was told that the City Manager was adamant that he resign that same afternoon. Hargray was not given (a) advance notice of the nature of the charges against him; (b) an opportunity to consider alternatives; (c) an opportunity to consult an attorney; (d) a reasonable time to make a carefully considered decision; or (e) the opportunity to select the effective date of his resignation.

The City's relies on *Stone v. Univ. of Maryland Medical System Corp.,* 855 F.2d 167 (4th Cir.1988), for its proposition that Hargray's resignation was voluntary. However, such reliance is misplaced due to the factual differences between the two cases. Plaintiff, Stone, was a sophisticated and well-educated hospital administrator with over thirty years experience as a member of staff of some of the finest hospitals in the country. In contrast to the instant case, Stone (i) was fully informed of the nature of the charges against him and knew what his rights were, and if he did not, he was given ample time to find out; (ii) was given several hours to contact an attorney and failed to do so; (iii) dictated the terms of his resignation himself and "drove a hard bargain, demanding that he be given a clean record, a delayed effective date, and a full year's salary;" and (iv) in the five months between his decision to resign and the filing of his lawsuit, made no effort to rescind his resignation. *Stone,* 855 F.2d at 177–178.

The Court finds that based on the totality of the circumstances under which Hargray's resignation was submitted, said resignation was involuntary. Therefore, it must be considered a deprivation by state action triggering the protections of the due process clause. *Stone,* 855 F.2d at 173.

### C. Procedural Due Process

■ The Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985). An essential principle of due process is that a deprivation of life, liberty, or property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Loudermill,* 470 U.S. at 542, 105 S.Ct. at 1493. This principle requires "some kind of a hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment. *Id.; Board of Regents v. Roth,* 408 U.S. 564, 569–50, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann,* 408 U.S. 593, 599, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972).

Abbreviated pre-termination proceedings may satisfy due process requirements if there is a full and fair hearing within a reasonable time after termination. *Loudermill,* 470 U.S. at 546, 105 S.Ct. at 1496; *Adams v. Sewell,* 946 F.2d 757, 765 (11th Cir.1991). The post-termination proceedings must provide the employee with an opportunity to present his case and cross-examine the witnesses against him in an impartial forum. *Adams,* 946 F.2d at 765; *Kelly v. Smith,* 764 F.2d 1412, 1415 (11th Cir.1985). There was no semblance of due process in connection with Hargray's forced resignation. The City did not provide Hargray written or oral notice of the charges against him prior to said resignation. Nor did the City provide him with a full and fair hearing with the opportunity to examine the evidence against him, present his case and cross-examine witnesses.

The City argues that Hargray waived his due process rights by failing to request a civil service hearing within fifteen days after the date of his resignation. The City appears to rely on Civil Service Rule XVI, Sections 1 and 3 for its position. (Pl.'s Ex. 5, tab 3). Section 3 provides, "When any employee in the classified service with permanent Civil Service status, who has been suspended, reduced in rank or dismissed, appeals to the board, the appeal must be made in writing within fifteen (15) days from the effective date of the suspension, reduction, or dismissal, and the Board within thirty (30) days shall proceed to hear such appeal." However, Section 1 states, "The discharge of a permanent employee shall not become effective until the department director shall have first served the said employee with a written notice of discharge, together with such facts in detail as shall enable the said employee to explain the situation in his own defense." The City's Personnel Director, Wroblewski, acknowledged that the fifteen days referred to in Section 3 does not begin until after the employee is served with the written notice of discharge. In addition, when Hargray contacted Wroblewski after the August 24th resignation, Wroblewski did not advise Hargray of his right to request a civil service hearing.

Due process rights may be waived. *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 185, 92 S.Ct. 775, 782, 31 L.Ed.2d 124 (1972). However, there is a strong presumption against waiver. *Id.; Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); *Johnson v. United States Dept. of Agriculture*, 734 F.2d 774, 784 (11th Cir. 1984). Waiver depends upon the facts of a particular case and is good only if it is done in an informed manner. *Johnson v. Zerbst*, 304 U.S. at 464, 58 S.Ct. at 1023; *Overmyer*, 405 U.S. at 186–87, 92 S.Ct. at 782–783. A waiver "is ordinarily an intentional relinquishment or waiver of a known right or privilege." *Johnson*, 304 U.S. at 464, 58 S.Ct. at 1023. The Court finds that Hargray did not waive his due process rights by not requesting a civil service hearing.

## D. Relief

Plaintiff seeks lost back pay and employment benefits, compensatory damages for mental and emotional distress and reinstatement of his employment with the City, or in the alternative, front pay. Mental and emotional distress caused by the denial of due process is compensable under 42 U.S.C. § 1983. *Carey v. Piphus*, 435 U.S. 247, 264, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978). A plaintiff must prove mental anguish and emotional distress in order to recover compensatory damages. Hargray presented evidence through himself, Vanessa Hargray, Mary Washington and Dr. Caren Singer concerning the mental and emotional distress he suffered as a result of the City's procedural due process violations.

The Eleventh Circuit has allowed a Section 1983 plaintiff to receive back pay, lost benefits, loss of future income and damages for mental anguish and emotional distress arising from procedural due process violations in the unjustified discharges of a public employee. *See, Wilson v. Taylor*, 733 F.2d 1539, 1550 (11th Cir.1984) (back pay reduced by the amount of other income received after his initial termination awarded to an unlawfully discharged police officer); *Murphy v. City of Flagler Beach*, 846 F.2d 1306, 1309 (11th Cir.1988) (mitigated damages is consistent with the compensatory purposes of Section 1983); *Stallworth v. Shuler*, 777 F.2d 1431, 1435 (11th Cir.1985) (the injury in civil rights cases may be intangible and need not be financial or physical but may include damages for humiliation and emotional distress (citing *Carey v. Piphus*, 435 U.S. 247, 263–64 & n. 20, 98 S.Ct. 1042, 1052–53 & n. 20, 55 L.Ed.2d 252 (1978))).

The Court having found that Hargray was terminated without justification, awards him full back pay and lost benefits minus his mitigated earnings. Based on the Stipulation to Damages filed by the parties on July 12, 1993, the Court awards Hargray $84,-334.97 representing lost back pay from August 24, 1990 through August 24, 1993, plus prejudgment interest. This amount represents the differential between what Hargray would have earned had he continued his employment with the City minus current earn-

ings from subsequent employment. (*See,* Ex. 1 to the Stipulation to Damages). In addition, the City is ordered to return, with interest, the $550.00 that was wrongfully withheld from Hargray's final paycheck.

Hargray has proven that he suffered mental anguish and emotional stress due to the unjustified deprivation of his property interest in continued employment without procedural due process. The Court awards Hargray $150,000.00 in compensatory damages for the mental anguish and emotional distress he suffered because of the City's violations of his constitutional rights.[14]

Reinstatement is the appropriate remedy in wrongful employee discharge cases and, except in extraordinary cases, is required. *Allen v. Autauga County Bd. of Educ.,* 685 F.2d 1302, 1305 (11th Cir.1982). *See also, Williams v. Roberts,* 904 F.2d 634, 639 (11th Cir.1990). This is not an extraordinary case. Although there was some indication by Hargray's superiors that he might not function efficiently if he were to return, there was no testimony from Hargray's subordinates that they would not work with or respect him. Furthermore, the City's counsel indicated that it is his belief that Hargray could function efficiently if he were to return because a judicial decision in his favor would give him "a clean badge." In addition, the City's counsel indicated to the Court that the City is acceptable to reinstatement and would implement it in good faith. Therefore, reinstatement is appropriate in the instant case.

### III. CONCLUSION

Based on the foregoing discussion, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. Defendant, City of Hallandale, shall pay to Plaintiff, Vernon E. Hargray, the following amounts:

(a) $84,884.97 representing back pay of $84,334.97 plus the $550.00 withheld from Hargray's final paycheck, plus prejudgment interest; and

(b) $150,000.00 in compensatory damages.

2. Defendant, City of Hallandale, shall reinstate Plaintiff, Vernon E. Hargray, to his previous position of Operations Manager in the Department of Public Works.

3. Any pending motions are denied as moot.

4. The Clerk is directed to enter final judgment in favor of Plaintiff, Vernon E. Hargray, and against Defendant, City of Hallandale, in accordance with this Order.

5. The Court shall retain jurisdiction over this cause in order to award attorneys' fees and costs upon appropriate motion by the Plaintiff.

**DONE AND ORDERED.**

---

**14.** In *Stallworth,* 777 F.2d at 1435, the court upheld a compensatory damage award of $100,-000 for section 1981 and 1983 violations.